[This opinion has been published in *Ohio Official Reports* at 88 Ohio St.3d 332.]

MCMULLEN, EXR., APPELLANT, *v.* OHIO STATE UNIVERSITY HOSPITALS, APPELLEE.

[Cite as *McMullen v. Ohio State Univ. Hosp.*, 2000-Ohio-342.]

*Torts—Wrongful death action against hospital—Applicability of loss-of-chance doctrine where plaintiff proves a direct causal relationship between decedent's death and a specific negligent act.*

(No. 98-2358—Submitted September 21, 1999—Decided April 12, 2000.)

APPEAL from the Court of Appeals for Franklin County, Nos. 97API10-1301 and 97API10-1324.

_____

{¶ 1} Georgia G. McMullen died on October 21, 1990, at the age of thirty-nine years. She was survived by her husband, a son, a daughter, and her mother. Following her death, her husband, who had been appointed executor of the estate by the Probate Court of Lawrence County, filed a wrongful death action in the Court of Claims naming Ohio State University Hospitals as defendant.

{¶ 2} The Court of Claims bifurcated the trial, separating the issues of liability and damages. Following trial on the issue of liability, the court, acting as factfinder, found the following to have been proven by a preponderance of the evidence.

{¶ 3} McMullen was diagnosed in late 1989 or early 1990 with acute myelogenous leukemia. She was given chemotherapy, and in July 1990, when the cancer was in remission, McMullen received an allogenic bone marrow transplant from her sister at OSU Hospitals. McMullen thereafter moved into a Columbus apartment for continued outpatient treatment.

{¶ 4} In September 1990, McMullen was readmitted to OSU Hospitals with high fevers and a possible viral infection. Her condition gradually worsened.

**{¶ 5}** In an effort to treat McMullen's breathing problems, hospital personnel administered an eighty-percent concentration of oxygen through an oxygen mask, but she continued to experience fluid buildup in her lungs and shortness of breath. An OSU resident physician recommended an elective intubation, in which an endotracheal tube ("ET tube") would be inserted through her mouth and throat and attached to a ventilator, as the only way to maintain her oxygenation level. The resident further told McMullen that her overall prognosis was poor. She consented to the use of a ventilator, and on October 11, the procedure was performed.

**{¶ 6}** On October 14, 1990, events occurred that the Court of Claims ultimately found to constitute a breach of the standard of care due McMullen by OSU Hospitals personnel. In its written findings of fact and conclusions of law on the issue of liability, the court described these October 14 events as follows.

**{¶ 7}** The attending nurse testified that McMullen's overall physical appearance, including her facial expression, changed quickly and dramatically. She heard a "squawking noise" or "cuff leak" coming from McMullen's ET tube and noticed that McMullen's oxygen saturation level had dropped to a critical level.

**{¶ 8}** When a second nurse arrived in response to her call for help, the nurses disconnected McMullen from the ventilator and began using an "ambubag" in an attempt to force a one-hundred-percent concentration of oxygen through her ET tube and into her lungs. McMullen was cyanotic and dyspneic. When the oxygen saturation level of McMullen's blood did not increase, they decided to remove the ET tube. The nurses believed McMullen was dying. However, they chose to utilize a "stat" page to call for assistance from the physicians on duty, instead of calling a "Code Blue," during this life-threatening emergency situation.

**{¶ 9}** Two doctors, including a resident in anesthesiology, arrived in response to the page and prepared to reintubate McMullen. Despite their efforts, it took the doctors several attempts, including at least six separate attempts by the anesthesiologist, before they were able to successfully reintubate McMullen. Their

reintubation attempts took in excess of twenty minutes. McMullen did not regain consciousness. She remained on the ventilator until her death seven days later on October 21, 1990.

{¶ 10} Based on these facts, the Court of Claims concluded that "the preponderance of the evidence in this case supports plaintiff['s] experts' opinion that defendant's nurses breached the standard of care by removing Mrs. McMullen's ET tube without an order from a physician and without the means to immediately re-intubate Mrs. McMullen." The court further found that the anesthesiologist's "actions fell below the standard of care expected of a third-year resident in anesthesiology when it took her six or more attempts to re-intubate Mrs. McMullen. This delay in re-intubation deprived Mrs. McMullen of proper oxygenation for over twenty minutes. The delay further caused Mrs. McMullen's oxygen saturation level in her blood to fall to a low of twenty-nine percent. An oxygen saturation level of twenty-nine percent is inconsistent with life and subsequently caused irreversible damage to Mrs. McMullen's brain, lungs, and heart."

{¶ 11} The court then turned to consider the decision in *Roberts v. Ohio Permanente Med. Group, Inc.* (1996), 76 Ohio St.3d 483, 668 N.E.2d 480, decided after the first phase of the trial, which dealt with claims for the loss of a less-than-even chance of recovery or survival. Based on *Roberts*, the court believed that "the sole remaining issues in the liability phase of this case are whether those deviations proximately caused Mrs. McMullen's death or proximately caused her to lose any chance of survival." In its findings at the end of the liability phase of the trial, the court summarized the conflicting expert testimony presented by both the plaintiff and the defendant as follows:

"On the issue of the proximate cause of Mrs. McMullen's death, plaintif[f] offered the expert testimony of Gerald Penn, M.D., Ph.D., who opined that an immediate cause of Mrs. McMullen's death ' * * * was a combination of diffuse alveolar damage of the lungs associated with a mass of ischemic damage to the heart,

pancreas, adrenals, brain and, most likely, the gastrointestinal tract.' Dr. Penn further testified that the anoxic or hypoxic episode on October 14, 1990, was a direct cause of all of these underlying causes of Mrs. McMullen's death. Finally, Dr. Penn testified that prior to the events on the morning of October 14, 1990, there was a 'high probability' that Mrs. McMullen would survive and leave the hospital. Accordingly the court can infer that in Dr. Penn's opinion, after the events of October 14, 1990, Mrs. McMullen had a diminished chance of surviving to leave the hospital.

"Defendant, on the other hand, provided the court with substantial expert medical testimony, all of which essentially maintained that Mrs. McMullen would never have survived to be taken off the ventilator and leave the hospital, regardless of the actions of its nurses and resident doctors. Dr. Neena Kapoor, Mrs. McMullen's attending physician and a bone marrow transplant specialist, testified that prior to October 14, 1990, Mrs. McMullen's chances of survival were less than fifty percent. Likewise, Dr. Wilmer testified that given her overall condition, Mrs. McMullen's prognosis was 'quite poor.' In addition, Dr. Roland Skeel, an oncologist, opined that Mrs. McMullen would have died within thirty days, notwithstanding the events of October 14, 1990."

{¶ 12} Based on this evidence, the court concluded: "Upon review of all the expert testimony, the court finds that prior to the events of October 14, 1990, Mrs. McMullen had a chance of surviving to leave the hospital. However, after the negligent medical treatment provided by defendant's critical care nurses and Dr. Campbell on October 14, 1990, Mrs. McMullen's chance of survival decreased to zero. Accordingly, the court shall render judgment in favor of plaintif[f]. Nevertheless, the court specifically leaves open for the damages phase of this trial the percentage of the chance of survival that Mrs. McMullen lost as a result of defendant's agents' negligence."

{¶ 13} Thereafter, the court conducted a trial on the issue of damages and determined that damages flowing from McMullen's death totaled $1 million. The

4

court further found that plaintiff had "proven by a preponderance of the evidence that the decedent had a twenty-five percent chance of survival" prior to the events of October 14. The court, applying the second paragraph of the syllabus of *Roberts*, then multiplied the total damages of $1 million by the twenty-five percent lost chance of survival and arrived at a preliminary award of damages in the amount of $250,000.

{¶ 14} The court further held that the $250,000 preliminary award was subject to reduction pursuant to R.C. 3345.40(B)(2) for collateral benefits received by the survivors, and ordered the case transferred to the Probate Court of Lawrence County for allocation of damages among the survivors and application of setoffs, pursuant to the procedures prescribed in *Van Der Veer v. Ohio Dept. of Transp.* (1996), 113 Ohio App.3d 60, 680 N.E.2d 230.

{¶ 15} The probate court allocated $245,000 of the award to Ruth Blackburn Gibson, the decedent's mother. The remaining $5,000 was allocated to McMullen's husband and two children, but was deemed wholly offset by collateral insurance recoveries by these members of McMullen's immediate family. Upon transfer of the case back to the Court of Claims, the court adopted the findings of the probate court and rendered final judgment for the executor in the amount of $245,000.

{¶ 16} Both the executor and the hospital appealed, although there was no challenge to the finding of the Court of Claims that OSU Hospitals employees had breached their standards of care in treating the decedent on the morning of October 14, 1990.

{¶ 17} In the court of appeals, the executor claimed that the trial court had erred in applying the *Roberts* loss-of-chance doctrine to the case and in reducing the full amount of $1 million damages. According to the executor, the loss-of-chance doctrine should not be applied to reduce damages in a case where the plaintiff proves that the negligence of defendant was the direct and sole cause of the ultimate harm.

{¶ 18} The hospital did not contest the Court of Claims' application of *Roberts* but asserted (1) that the Court of Claims' determination that McMullen had

lost a twenty-five-percent chance of survival was against the manifest weight of the evidence, (2) that the Court of Claims had erred in referring the allocation of damages and application of setoffs to the Lawrence County Probate Court, and (3) that the Court of Claims had erred in adopting the probate court's allocation of ninety-eight percent of the $250,000 damages to decedent's mother and only two percent to her immediate family members and in setting off collateral benefits based on those allocations.

{¶ 19} In a split decision, the court of appeals agreed with the hospital that the lost-chance doctrine as set forth in *Roberts* was applicable but found that the Court of Claims had no evidentiary basis for establishing McMullen's lost chance of survival at twenty-five percent and remanded this issue.

{¶ 20} The dissenting judge found that plaintiff "does not present a lost chance of survival case" but instead "presents a straightforward medical malpractice case. * * * Unlike the lost chance case, plaintiff's case presents a superimposed act of malpractice, not a malpractice which hastens or aggravates the pre-existing condition."

{¶ 21} However, the court of appeals unanimously agreed with the hospital that the Court of Claims had erred in referring the allocation of damages and application of setoffs to the Lawrence County Probate Court. In so doing, the court of appeals overruled its decision in *Van Der Veer*, found that only the Court of Claims had jurisdiction to determine issues of liability on the part of the state, and declared the probate court's allocation and setoff judgment void for lack of subject matter jurisdiction. It instructed the Court of Claims, on remand, to hold a hearing on collateral-benefit setoffs pursuant to R.C. 3345.40(B)(2) and to itself determine the amount of collateral benefits that should be deducted from its preliminary $250,000 judgment. Final distribution of the judgment among the beneficiaries was then to be accomplished by the Lawrence County Probate Court pursuant to R.C. 2125.03(A).

{¶ 22} The cause is now before this court pursuant to the allowance of a discretionary appeal.

_____

*Butler, Cincione, DiCuccio, Dritz & Barnhart, N. Gerald DiCuccio* and *Gail M. Zalimeni*, for appellant.

*Betty D. Montgomery*, Attorney General; *Kegler, Brown, Hill & Ritter* and *Anthony C. White*, for appellee.

*A. William Zavarello Co., L.P.A., A. William Zavarello* and *Rhonda Gail Davis*, urging reversal for *amicus curiae*, Ohio Academy of Trial Lawyers.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 23} The issue to be decided in this case is whether the loss-of-chance doctrine applies in a case where a plaintiff proves a direct causal relationship between the decedent's death and a specific negligent act. Further, although the court of appeals correctly decided that the Court of Claims, rather than the probate court, has exclusive, original jurisdiction to determine collateral-source deductions under R.C. 3345.40(B)(2), it erred in requiring that those deductions be made before the damage award is allocated among the beneficiaries.

I

Loss of Chance

{¶ 24} The Court of Claims found that appellee's negligence "*caused* Mrs. McMullen's oxygen saturation level in her blood to fall to a low of twenty-nine percent. An oxygen saturation level of twenty-nine percent is *inconsistent with life* and subsequently *caused* irreversible damage to Mrs. McMullen's brain, lungs, and heart." (Emphasis added.)

{¶ 25} Since the only suggested cause of death in this case is the anoxic or hypoxic episode on October 14, 1990, which the trial court attributed solely to negligence on the part of appellee, the above-quoted finding should have been

dispositive of the causation aspect of this case. The case became complicated only when the trial court began to analyze the issue of causation in terms of increased risk. Apparently the trial court believed, as did the majority of the court of appeals, that a wrongful death claimant must involuntarily use an increased-risk theory of recovery, with its attendant formula for reducing damages, whenever the decedent's chance of survival from any preexisting condition is less than even. However, in recognizing a cause of action for the loss of a less-than-even chance of recovery or survival, we never intended to force this theory on a plaintiff who could otherwise prove that specific negligent acts of the defendant caused the ultimate harm.

{¶ 26} In *Cooper v. Sisters of Charity of Cincinnati, Inc.* (1971), 27 Ohio St.2d 242, 56 O.O.2d 146, 272 N.E.2d 97, at the syllabus, we held:

"In an action for wrongful death, where medical malpractice is alleged as the proximate cause of death, and plaintiff's evidence indicates that *a failure to diagnose the injury prevented the patient from an opportunity to be operated on, which failure eliminated any chance of the patient's survival*, the issue of proximate cause can be submitted to the jury only if there is sufficient evidence showing that *with proper diagnosis, treatment and surgery, the patient probably would have survived.*" (Emphasis added.)

{¶ 27} In *Roberts v. Ohio Permanente Med. Group, Inc.* (1996), 76 Ohio St.3d 483, 668 N.E.2d 480, paragraph one of the syllabus, we overruled *Cooper*, holding:

"In order to maintain an action for the loss of a less-than-even chance of recovery or survival, the plaintiff must present expert medical testimony showing that the health care provider's negligent act or omission *increased the risk of harm* to the plaintiff. It then becomes a jury question as to whether the defendant's negligence was a cause of the plaintiff's injury or death." (Emphasis added.)

{¶ 28} In so holding, we followed the approach set forth in 2 Restatement of the Law 2d, Torts (1965), Section 323, which provides:

8

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

"(a) his failure to exercise such care increases the risk of such harm."

{¶ 29} In *Hamil v. Bashline* (1978), 481 Pa. 256, 269-270, 392 A.2d 1280, 1286-1287, the Supreme Court of Pennsylvania explained:

"Section 323(a) recognizes that a particular class of tort actions, of which the case at bar is an example, differs from those cases normally sounding in tort. Whereas typically a plaintiff alleges that a defendant's act or omission set in motion a force which resulted in harm, the theory of the present case is that the defendant's act or omission failed in a duty to protect against harm from another source. To resolve such a claim a fact-finder must consider not only what *did* occur, but also what *might* have occurred, *i.e.*, whether the harm would have resulted from the independent source even if defendant had performed his service in a non-negligent manner. Such a determination as to what *might* have happened necessarily requires a weighing of probabilities." (Emphasis *sic*; footnote omitted.)

{¶ 30} In reviewing the many cases on the subject, a particular factual situation is discernible to which the loss-of-chance doctrine is invariably applied. In those cases, the plaintiff or the plaintiff's decedent is already suffering from some injury, condition, or disease when a medical provider negligently diagnoses the condition, fails to render proper aid, or provides treatment that actually aggravates the condition. As a result, the underlying condition is allowed to progress, or is hastened, to the point where its inevitable consequences become manifest. Unable to prove that the provider's conduct is the direct and the only cause of the harm, the plaintiff relies on the theory that the provider's negligence at least increased the risk of injury or death by denying or delaying treatment that might have inured to the victim's benefit. The focus then shifts away from the cause of the ultimate harm

itself, and is directed instead on the extent to which the defendant's negligence caused a reduction in the victim's likelihood of achieving a more favorable outcome. See *Wendland v. Sparks* (Iowa 1998), 574 N.W.2d 327; *Delaney v. Cade* (1994), 255 Kan. 199, 873 P.2d 175; *Donnini v. Ouano* (1991), 15 Kan.App.2d 517, 810 P.2d 1163; *Perez v. Las Vegas Med. Ctr.* (1991), 107 Nev. 1, 805 P.2d 589; *McKellips v. St. Francis Hosp., Inc.* (Okla.1987), 741 P.2d 467; *Herskovits v. Group Health Coop. of Puget Sound* (1983), 99 Wash.2d 609, 664 P.2d 474; *Jones v. Montefiore Hosp.* (1981), 494 Pa. 410, 431 A.2d 920; *Hamil, supra*; *Daniels v. Hadley Mem. Hosp.* (C.A.D.C.1977), 566 F.2d 749; *Bellaire Gen. Hosp., Inc. v. Campbell* (Tex.Civ.App.1974), 510 S.W.2d 94; *Kallenberg v. Beth Israel Hosp.* (1974), 45 A.D.2d 177, 357 N.Y.S.2d 508, affirmed (1975), 37 N.Y.2d 719, 374 N.Y.S.2d 615, 337 N.E.2d 128; *Hernandez v. Clinica Pasteur, Inc.* (Fla.App.1974), 293 So.2d 747; *Whitfield v. Whittaker Mem. Hosp.* (1969), 210 Va. 176, 169 S.E.2d 563; *Hicks v. United States* (C.A.4, 1966), 368 F.2d 626; Annotation, Medical Malpractice: Measure and Elements of Damages in Actions Based on Loss of Chance (1990), 81 A.L.R.4th 485; Annotation, Medical Malpractice: "Loss of Chance" Causality (1987), 54 A.L.R.4th 10.

{¶ 31} The plaintiff should not, however, be involuntarily confined within the limits of an increased-risk or loss-of-chance theory where her efforts to prove a direct causal relationship between the defendant's negligence and the decedent's death are successful.[1] "Section 323(a) was designed to *relax* a plaintiff's burden of proving

---

1. Appellee directs our attention to *Wendland, supra*, and *Dickey v. Daughety* (1996), 260 Kan. 12, 917 P.2d 889, and points out that the loss-of-chance doctrine has not been limited to cases involving negligent diagnosis. We agree, but that is a different issue from whether and under what circumstances the doctrine can be forced upon a plaintiff or used defensively. In *Wendland*, and in those cases cited in *Wendland*, the doctrine was applied to situations where defendant's negligence caused a failure or delay in treatment. In *Dickey*, the doctrine was applied against a physician who, while attempting to replace a chest tube, accidentally lacerated the patient's artery, causing her death. However, it was the estate of the deceased patient that brought the wrongful death action based on loss of chance of survival. Thus, the issue of whether the doctrine could have been raised defensively, despite direct causative evidence, was not an issue in that case.

causation, not to compound it." (Emphasis *sic*.) *Jones, supra*, 494 Pa. at 418, 431 A.2d at 924. As one writer explains, the lost-chance "issue must be conditioned upon a negative finding of proximate cause." Perdue, Recovery for a Lost Chance of Survival: When the Doctor Gambles, Who Puts Up the Stakes? (1987), 28 So.Tex.L.Rev. 37, 60.

{¶ 32} In *Ulmer v. Ackerman* (1993), 87 Ohio App.3d 137, 621 N.E.2d 1315, which was decided after our decision in *Cooper* but before our decision in *Roberts*, plaintiff brought a medical malpractice action alleging that decedent's death was caused by an anesthesiologist's premature removal of an endotracheal tube. At trial, plaintiff presented expert medical testimony that defendant's conduct was the sole cause of decedent's death, but the trial court directed a verdict in defendant's favor, finding that plaintiff failed to prove that decedent would have survived but for defendant's negligence. The court of appeals reversed, finding that "the establishment of the sole cause of death necessarily imports that the individual would have survived absent the departure from the standard of care." *Id.*, 87 Ohio App.3d at 144, 621 N.E.2d at 1319. However, more basic than that, the court of appeals found:

"The trial court, in granting the motion for directed verdict, mistakenly relied on [*Cooper*] as requiring plaintiff's showing by expert testimony that Ulmer would have survived his surgery and postoperative difficulties but for the negligence of the anesthesiologist. In the matter at hand, however, where no other alternative save decedent's death may be inferred from the defendant's conduct according to expert medical testimony, no occasion arose for disproof of other alternatives, as in the case of the claimed wrong diagnosis and ensuing wrong treatment of the dying patient in *Cooper*. The issue of whether the physician's misjudgment precluded an alternative certain chance of survival is not presented." *Id.*, 87 Ohio App.3d at 143, 621 N.E.2d at 1319.

**{¶ 33}** In *Anderson v. Picciotti* (1996), 144 N.J. 195, 676 A.2d 127, plaintiff alleged that the defendant negligently amputated her right great toe pursuant to a misdiagnosis of osteomyelitis. After the cause was tried, the defendant requested a charge on loss of chance, arguing that there was a risk that the toe would have been amputated in any event. The trial court denied the defendant's request, stating:

"I kept getting a feeling I was trying to force a square peg into a round hole by trying to make this case fit into that increased risk, loss of chance line of cases. I don't think that this is the type of case that the courts were looking at when they rendered their decisions in these cases. This isn't really a lost chance case, the testimony and the allegations by the plaintiff really don't go to any allegations of increased risk based on what the defendant did or did not do * * *. I don't think that there is an argument that the defendant's negligence combined with the pre-existing condition to cause the injury * * *." *Id.*, 144 N.J. at 202, 676 A.2d at 131.

**{¶ 34}** The New Jersey Supreme Court agreed, holding that the defendant was not entitled to a charge on increased risk absent "any evidence that defendant's negligence combined with a preexistent condition to cause plaintiff harm." In order for the defendant to benefit from the loss-of-chance concept, he must "establis[h] that plaintiff's damages were induced by concurrent causes, one of which was a preexistent condition unrelated to defendant's negligence." *Id.*, 144 N.J. at 207-208, 676 A.2d at 134.

**{¶ 35}** In the present case, the negligence of hospital personnel did not merely combine with a preexisting condition to create the ultimate harm, it directly caused the ultimate harm. Their actions in this case did not merely make it uncertain whether the decedent would have survived, they made it certain that she would not survive. Appellee's personnel not only failed in their duty to protect decedent from harm, they set in motion another, independent force that directly caused her death. This is not a situation where negligence merely hastened or aggravated the effects of a preexisting condition or allowed it to progress untreated. Once the trial court determined that

actions by hospital personnel were inconsistent with decedent's life, it became wholly unnecessary to inquire as to whether their negligence also increased the risk of physical harm to decedent. Having determined that negligence caused the death, the trial court should not have proceeded to consider what probably would have happened in the absence of negligence. The former finding should have subsumed the latter.

{¶ 36} Thus, we agree with Judge Peggy Bryant, who, dissenting below, stated that this "case presents a straightforward medical malpractice case, not a case under *Cooper* and *Roberts*. Whether or not a lost chance of survival should be an additional element of recovery is not at issue. * * * Unlike the lost-chance case, plaintiff's case presents a superimposed act of malpractice, not a malpractice which hastens or aggravates the pre-existing condition."

{¶ 37} Accordingly, the judgment of the court of appeals is reversed on this issue.

II

Collateral-Benefit Setoffs

{¶ 38} Section 16, Article I of the Ohio Constitution provides that "[s]uits may be brought against the state, in such courts and in such manner, as may be provided by law." R.C. 2743.03 created the Court of Claims, vesting it with "exclusive, original jurisdiction of all civil actions against the state permitted by the waiver of immunity contained in section 2743.02 of the Revised Code." Under R.C. 2743.02(A)(1), the state's waiver of immunity "is subject to the limitations set forth in this chapter and, in the case of state universities or colleges, in section 3345.40 of the Revised Code."

{¶ 39} R.C. 3345.40(B)(2) provides that "[i]f a plaintiff receives or is entitled to receive benefits for injuries or loss allegedly incurred from a policy or policies of insurance or any other source, the benefits shall be disclosed to the court, and the

amount of the benefits shall be deducted from any award against the state university or college recovered by the plaintiff."

{¶ 40} In contrast, the probate court has exclusive jurisdiction to "order the distribution of estates." R.C. 2101.24(A)(1)(c). This includes the jurisdiction to distribute among the beneficiaries the amount received by a personal representative in an action for wrongful death. R.C. 2125.03(A)(1). In that case, "[t]he court that appointed the personal representative * * * shall adjust the share of each beneficiary in a manner that is equitable, having due regard for the injury and loss to each beneficiary resulting from the death and for the age and condition of the beneficiaries." *Id.* However, this section does not empower the probate court to determine collateral-source deductions in actions brought against a state university, and that function remains exclusively with the Court of Claims.

{¶ 41} Thus, the court of appeals correctly concluded that the Court of Claims, rather than the probate court that appointed the personal representative, has exclusive, original jurisdiction to determine the deduction of collateral benefits pursuant to R.C. 3345.40(B)(2). However, in remanding the cause on this issue, the court of appeals erred when it directed the Court of Claims to offset collateral benefits before the probate court allocates the aggregate award among the beneficiaries pursuant to R.C. 2125.03(A)(1).

{¶ 42} In *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 633 N.E.2d 504, syllabus, we held that "R.C. 2317.45 violates Sections 2, 5 and 16, Article I of the Ohio Constitution, and is unconstitutional *in toto*." In holding R.C. 2317.45 to be violative of the Due Process Clause of Section 16, Article I of the Ohio Constitution, we explained:

"Of primary significance is that the statute requires deductions from jury verdicts irrespective of whether a collateral benefit defined in R.C. 2317.45(A)(1) is actually included in the verdict. While the goal of preventing double recoveries is not arbitrary or unreasonable, * * * R.C. 2317.45 fails to take into account whether

the collateral benefits to be deducted are within the damages actually found by the jury, especially where there are no interrogatories to quantify the categories of damages that make up the general verdict. Thus, the statute can arbitrarily reduce damages that a jury awards a plaintiff, since under the statute it is irrelevant whether any collateral benefit actually represents any portion of the jury's award." *Id.*, 69 Ohio St.3d at 423-424, 633 N.E.2d at 511.

**{¶ 43}** In *Buchman v. Wayne Trace Local School Dist. Bd. of Edn.* (1995), 73 Ohio St.3d 260, 652 N.E.2d 952, we considered the constitutionality of R.C. 2744.05(B), which provides for the deduction of collateral benefits from awards against political subdivisions. In so doing, we adhered to the proposition that deductions for collateral benefits are constitutionally permitted only to the extent that the loss for which the collateral benefit compensates is actually included in the award. We put it succinctly that "there shall be no constitutionality without a requirement that deductible benefits be matched to those losses actually awarded." *Id.*, 73 Ohio St.3d at 269, 652 N.E.2d at 960. We upheld the constitutionality of R.C. 2744.05(B) because its language was susceptible of an interpretation that requires the matching of deductible benefits to damages actually awarded.

**{¶ 44}** However, even more basic than this, due process requires that the collateral benefits to be deducted belong to the party whose recovery is to be offset. Due process does not allow one party's recovery to be reduced by another person's collateral benefits. Thus, we held in *Buchman* that "[t]he Social Security benefits which Donald's children have received or are entitled to receive, however, are not deductible from the jury's verdict. No part of the $5,082,482 verdict against which Wayne Trace seeks to offset these benefits was awarded to Donald's children." *Id.*, 73 Ohio St.3d at 265, 652 N.E.2d at 957.

**{¶ 45}** Since the language of R.C. 3345.40(B)(2) is virtually identical to that of R.C. 2744.05(B), the court of appeals correctly determined that it too is susceptible of an interpretation that requires the matching of deductible benefits to losses actually

awarded. The court of appeals also seemed to accept the idea, at least in principle, that deductions be taken on a beneficiary-by-beneficiary basis, when it held that "the Court of Claims shall deduct the collateral benefits received by each beneficiary from the damage award to the extent that the loss for which a given collateral benefit compensates is duplicated in the damages actually awarded *to that beneficiary*." (Emphasis added.)

{¶ 46} However, the court of appeals failed to account for the fact that, in a wrongful death action involving multiple beneficiaries, the beneficiaries may not be entitled to recover the amounts respectively awarded to each of them in the Court of Claims. Instead, their proportionate shares of the aggregate award are subject to adjustment by the probate court under R.C. 2125.03(A)(1). Simply put, the probate court may allocate the aggregate award among the beneficiaries differently than was done in the Court of Claims. In this situation, the approach taken by the court of appeals, which requires collateral-source deductions before final distribution, could arbitrarily reduce one beneficiary's award by another beneficiary's collateral benefits.

{¶ 47} Appellant effectively illustrates this point by use of the following example:

"For example, the Court of Claims could determine that the surviving spouse suffered damages in the amount of Five Hundred Thousand Dollars ($500,000.00) and that a minor child has been damage[d] in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00). The Court of Claims could then set off Five Hundred Thousand Dollars ($500,000.00) in insurance proceeds received by the surviving spouse and enter an award in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00). Under the Court of Appeals procedure, a Probate Court would then determine the distribution of the Two Hundred Fifty Thousand Dollars ($250,000.00). If the Probate Court determines that the surviving spouse and the minor child are each entitled to One Hundred Twenty-Five Thousand Dollars

($125,000.00), the amount recoverable by the minor child would have been decreased by insurance proceeds not actually received by the minor child. This result would violate the mandate of *Buchman*."

{¶ 48} In addition, by forcing collateral-source deductions before final distribution, the court of appeals causes the statute to operate contrary to its presumed constitutional goal, which is to eliminate or prevent double *recovery*. *Sorrell, supra*, 69 Ohio St.3d at 423-424, 633 N.E.2d at 511.

{¶ 49} Both the parties and the court of appeals in this case have led us to believe that we must choose between two extreme procedural approaches in attempting to resolve the interplay between Section 16, Article I of the Ohio Constitution, R.C. 3345.40(B)(2), and 2125.03(A)(1). They have presented us with the options of either having the probate court effectuate collateral-source deductions, which it clearly has no jurisdiction to do, or allowing the Court of Claims to make the deductions before the probate court allocates the award among the beneficiaries, which is clearly in violation of *Buchman* and *Sorrell*.

{¶ 50} It is not necessary to choose between these two options. Rather, the solution is to have the Court of Claims make the collateral-source deductions required by R.C. 3345.40(B)(2) in accordance with *Buchman*, but only after the probate court adjusts the share of each beneficiary pursuant to R.C. 2125.03(A)(1).

{¶ 51} Accordingly, the judgment of the court of appeals is reversed as to this issue.

{¶ 52} Based on all of the foregoing, the judgment of the court of appeals is reversed, and the cause is remanded to the Court of Claims to do the following: (1) enter judgment in appellant's favor on the issue of liability for causing decedent's death; (2) without conducting a new trial on the issue of damages, assess damages from the evidence already submitted based on decedent's life expectancy, taking into account decedent's condition at the time of her death, as in any other malpractice case; (3) refer the cause to the Probate Court of Lawrence County to distribute that

award among the beneficiaries; and (4) deduct collateral benefits received by each beneficiary, pursuant to *Buchman*, from that beneficiary's share of the award as adjusted by the probate court.

*Judgment reversed*

*and cause remanded.*

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

_____

**MOYER, C.J., dissenting.**

**{¶ 53}** I dissent from the holding of the majority that the theory of loss of a less-than-even chance of recovery or survival adopted by this court in *Roberts v. Ohio Permanente Med. Group, Inc*. (1996), 76 Ohio St.3d 483, 668 N.E.2d 480, is not applicable to the case at bar.

**{¶ 54}** In recounting the facts of this case, the majority acknowledges that McMullen was very, very ill in the days preceding October 14, 1990, prior to any acts alleged to have constituted breaches of standards of care required of OSU Hospital employees. The majority recognizes it to be fact that McMullen's oxygen saturation level "had dropped to a critical level," and that she was cyanotic and dyspneic on that morning, *before* hospital nurses attended to her. It concedes that McMullen's oxygen saturation level did not increase despite infusion of one hundred percent oxygen through the ET tube prior to the nurses' removal of it.

**{¶ 55}** The evidence thus supports the conclusion that the hypoxia that the majority concludes caused McMullen's death had begun *before* any acts of alleged professional negligence. It is not factually clear that McMullen would have responded favorably, and avoided death resulting from oxygen insufficiency, had the nurses not removed the tube or had the residents more quickly reinserted it. At most, their conduct deprived her only of a *chance* to recover.

18

{¶ 56} The majority concludes that "the negligence of hospital personnel did not merely combine with a preexisting condition to create the ultimate harm," *i.e.*, McMullen's death. That this conclusion cannot be supported by common sense or the law is demonstrated by the fact that the vast majority of people in this world are not dependent upon properly inserted endotracheal tubes to ensure blood-oxygen levels consistent with life. The majority further states that hospital personnel "set in motion another, *independent force* that directly caused her death." (Emphasis added.) That observation in effect changes the test announced in *Roberts*.

{¶ 57} Under traditional tort law, proof of a causal connection not rising to a level of proximate cause is insufficient to justify a finding of liability and award of damages. Prior to *Roberts*, in cases where the injury complained of was death resulting from medical malpractice, a plaintiff could establish proximate cause sufficient to support liability only by producing evidence that the patient probably would have survived had he or she been treated in accordance with the appropriate standard of care. *Cooper v. Sisters of Charity of Cincinnati, Inc.* (1971), 27 Ohio St.2d 242, 56 O.O.2d 146, 272 N.E.2d 97, syllabus. No distinction was drawn between patients who were healthy before the alleged malpractice and those who already had conditions that jeopardized their continued health. Damages were awarded on an all-or-nothing basis.

{¶ 58} In *Roberts,* this court overruled *Cooper* and adopted a new theory of recovery, which it described as "loss of a less-than-even chance of recovery or survival," in which the amount of damages recoverable by a plaintiff equals "the total sum of damages for the underlying injury or death assessed from the date of the negligent act or omission multiplied by the percentage of the lost chance." *Roberts,* paragraph two of the syllabus. Accordingly, in lost-chance cases, those plaintiffs who are unable to meet the "but for" test (that the full extent of their injuries would not have occurred but for negligence on the part of medical providers) are not completely

barred from recovery. Rather, they receive damages in proportion to the percentage of chance of recovery of which they were deprived.

{¶ 59} As generally viewed, in a case involving loss of a less-than-even chance, the plaintiff is not awarded compensation for the death itself. Rather, the plaintiff seeks compensation for the injury of having been deprived of a chance of a more favorable ultimate result despite the existence of a preexisting adverse medical condition. See *Roberts*, 76 Ohio St.3d at 485, 668 N.E.2d at 482 ("[T]he plaintiff, who was already suffering from some disease or disorder at the time the malpractice occurred, *can recover for his or her 'lost chance'* even though the possibility of survival or recovery is less than probable." [Emphasis added.]), citing Keith, Loss of Chance: A Modern Proportional Approach to Damages in Texas (1992), 44 Baylor L.Rev. 759, 760. See, also, King, Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences (1981), 90 Yale L.J. 1353, 1354 ("Courts have had difficulty perceiving that a chance of avoiding some adverse result or of achieving some favorable result is a compensable interest in its own right."); *id.* at 1382 ("Regardless of whether it could be said that the defendant caused the decedent's death, he caused the loss of a chance, and that chance-interest should be completely redressed in its own right."). Pursuant to *Roberts*, the value of such a chance interest is determined by first calculating the full value of damages resulting from the ultimate injury (here, death), and then reducing the damages by multiplying them by the percentage of chance lost by the patient due to the malpractice of the defendant.

{¶ 60} The case before us is analogous to a typical loss-of-chance case based on misdiagnosis or nondiagnosis, in which the plaintiff is compensated because tortious conduct deprived him or her of an opportunity to attempt to arrest a disease in its natural progression. This is exactly the situation that occurred in the case at bar when hospital personnel were unable to provide McMullen with adequate oxygen

levels through artificial means when her disease had progressed to the point where her respiratory system no longer was functioning naturally on its own.

{¶ 61} But today the majority sanctions the award of full damages to McMullen's estate despite the fact that the trial court clearly found that McMullen had only a twenty-five-percent chance of surviving her medical condition had no medical negligence occurred. Stated differently, the trial court found it to be fact that it was three times as likely that McMullen would not have recovered from her illness as it was that she would have recovered, even had she been treated in full compliance with the required standards of care. Despite this, the majority finds that an award of full damages is appropriate in this case.

{¶ 62} The majority simply misinterprets the written opinion of the trial court in characterizing it as holding that the defendant's failure to adhere to the required standards of care proximately caused McMullen's death, thereby justifying an award of the full amount of damages arising out of her death.

{¶ 63} The court of appeals correctly recognized that it "is clear from the Court of Claims' discussion of causation that the court chose not to adopt [plaintiff's experts'] testimony that decedent had a better than fifty-percent chance of surviving at the time of University Hospital's breach of its duty of care," and that the Court of Claims further found it to be fact that "decedent had less than a fifty-percent chance of surviving prior to University Hospital's breach."

{¶ 64} The majority instead concludes that the trial court found it to be fact that the anoxic or hypoxic episode of October 14, 1990, was "solely" attributable to negligence on the part of hospital employees. The majority relies upon a brief excerpt from the trial court's opinion to justify its conclusion. That excerpt is taken, out of context, from the trial court's discussion of the standard of care required of the OSU resident doctors (and not that part of the opinion dealing with legal causation). In fuller context, that excerpt states:

"*In regard to the standard of care* expected of defendant's resident doctors, plaintif[f] offered the videotaped expert medical testimony of Carl Meyer, M.D. (Dr. Meyer), a board certified anesthesiologist. Dr. Meyer testified that defendant's resident physician, Deborah Campbell, fell below the appropriate standard of care expected of an anesthesiologist in her third year of residency operating under the same or similar circumstances. Specifically, Dr. Meyer testified that Dr. Campbell deviated from the expected standard of care both by virtue of the number of attempts it took her to re-intubate Mrs. McMullen and because she did not seek assistance when she could not timely complete the re-intubation.

"Upon review, the court agrees with Dr. Meyer and *finds that Dr. Campbell's actions fell below the standard of care* expected of a third year resident in anesthesiology when it took her six or more attempts to re-intubate Mrs. McMullen. This delay in re-intubation deprived Mrs. McMullen of proper oxygenation for over twenty minutes. The delay further caused Mrs. McMullen's oxygen saturation level in her blood to fall to a low of twenty-nine percent. An oxygen saturation level of twenty-nine percent is inconsistent with life and subsequently caused irreversible damage to Mrs. McMullen's brain, lungs, and heart." (Emphasis added.)

{¶ 65} Several points should be made in regard to this portion of the trial court's decision. First, the trial court does not state that the removal of the tube, or failure to timely reinsert it, caused McMullen's death. Rather, in stating that the "delay in re-intubation deprived Mrs. McMullen of proper oxygenation for over twenty minutes," the trial court does no more than make a factual finding that hospital personnel did not timely perform acts that might, or might not, have restored McMullen's blood-oxygen levels to adequate levels in time to avoid permanent damage. The trial court makes this statement in support of its conclusion that that failure constituted a violation of the standard of care required of a third-year anesthesiology resident—not in connection with determination of proximate cause.

**{¶ 66}** The trial court then continues by concluding that the "delay further caused Mrs. McMullen's oxygen saturation level in her blood to fall to a low of twenty-nine percent," but does not specify what McMullen's oxygen levels were at the time when the nurses responded to the crisis or the time when the tube should have been correctly reinserted—the earliest times of alleged professional negligence. In the context of the opinion read as a whole, it is clear that the trial court found as fact that McMullen's oxygen levels had fallen low enough to cause hypoxia before any medical negligence, although the failure to timely reintubate resulted in those levels falling ultimately to a low of twenty-nine percent.

**{¶ 67}** Second, the majority inaccurately states that "[o]nce the trial court determined that actions by hospital personnel were inconsistent with decedent's life, it became wholly unnecessary to inquire as to whether their negligence also increased the risk of physical harm to decedent." But the trial court did not find that the doctors' and nurses' acts were inconsistent with life; rather, it expressly found that "an oxygen saturation level of twenty-nine percent" is inconsistent with continued life. The trial court decision can just as reasonably be interpreted to mean that McMullen had depressed oxygen levels that ultimately would have led to death irrespective of whether negligence occurred subsequently.

**{¶ 68}** Third, the trial court concluded in its first opinion that "prior to the events of October 14, 1990, Mrs. McMullen had a chance of surviving to leave the hospital." The trial court did not, however, here express an opinion as to whether it agreed with the competing testimony of the appellant's experts, as opposed to the defense experts, as to the percentage chance of recovery McMullen possessed at the time the professional negligence occurred. Instead, the trial court "specifically [left] open for the damages phase of this trial the percentage of the chance of survival that Mrs. McMullen lost as a result of defendant's agents' negligence." Moreover, in the portion of the trial court's first decision specifically discussing proximate causation, the trial court wrote:

"Given that the court has concluded that the treatment by defendant's critical care nurses and defendant's resident, Dr. Campbell, fell below the standards of care expected of them, the sole *remaining* issues in the liability phase of this case are whether those deviations proximately caused Mrs. McMullen's death *or* proximately caused her to lose any chance of survival." (Emphasis added.)

{¶ 69} Had the trial court meant the earlier excerpt, which the majority cites, as a finding that the trial court found hospital actions to be the sole cause of McMullen's death, the trial court would not have described the issue of proximate cause as being an issue remaining for resolution.

{¶ 70} The question remains how it is to be determined whether, in any individual case of alleged medical negligence, lost-chance principles should be applied (resulting in proportionately reduced damages), as opposed to traditional proximate causation analysis (resulting in award of full damages). Professor King offered such guidelines in a 1998 followup to his seminal 1981 article in the Yale Law Journal, *supra* (which the *Roberts* court cited with approval), by suggesting that the loss-of-chance doctrine should be applied where the following criteria are present: "(1) the defendant tortiously failed to satisfy a duty owed to the victim to protect or preserve the victim's prospects for some more favorable outcome; (2) either (a) the duty owed to the victim was based on a special relationship, undertaking, or other basis sufficient to support a preexisting duty to protect the victim's likelihood of a more favorable outcome, or (b) the only question was how to reflect the presence of a preexisting condition in calculating the damages for a materialized injury that the defendant is proven to have probably actively, tortiously caused; (3) the defendant's tortious conduct reduced the likelihood that the victim would have otherwise achieved a more favorable outcome; and (4) the defendant's tortious conduct was the reason it was not feasible to determine precisely whether or not the more favorable outcome would have materialized but for the tortious conduct." King, "Reduction of Likelihood" Reformulation and Other Retrofitting of the Loss-of-a-Chance Doctrine

(1998), 28 U.Mem.L.Rev. 491, 495. Professor King's guidelines are consistent with our decision in *Roberts* and should be followed in this case.

{¶ 71} Even if the majority were correct that the negligence of OSU Hospital had a "direct causal relationship" to McMullen's death, lost-chance principles should be applied pursuant to item 2(b) of King's guidelines.

{¶ 72} Since *Roberts*, this court has not decided a medical negligence case involving a loss of *greater* than even chance of recovery. Nor has this court yet entertained the argument that the total amount of damages awarded in such a case should be adjusted to reflect a patient's preexisting conditions.

{¶ 73} Assuming *arguendo* that the trial court had accepted the testimony of plaintiff's expert that McMullen had a sixty-percent chance of achieving a full recovery had she not been subjected to hospital negligence, *i.e.*, a greater than even chance of recovery, we would be faced with the question whether, since the adoption of *Roberts*, an award of damages should be governed by loss-of-chance principles as opposed to the all-or-nothing rules established by traditional tort law where a patient has significant preexisting life-threatening conditions.

{¶ 74} However, in *Roberts* this court did state that in loss-of-chance cases, " 'the defendant should be subject to liability *only* to the extent that he tortiously contributed to the harm by allowing a preexisting condition to progress or by aggravating or accelerating its harmful effects, or to the extent that he otherwise caused harm in excess of that attributable [solely] to preexisting conditions.' " (Emphasis added.) *Roberts*, 76 Ohio St.3d at 489, 668 N.E.2d at 484, quoting *King*, *supra*, 90 Yale L.J. at 1360. See, also, *id.* at 1387 (noting that under the traditional, all-or-nothing rule, by compensating the fifty-percent-plus chance as though it were one hundred percent, courts overcompensate the plaintiff, and suggesting that this result is "as questionable as the extreme reached when the all-or-nothing concept denies any redress for the destruction of a not-better-than-even chance"). See, also, Kieffer, The Case for Across-the-Board Application of the Loss-of-Chance Doctrine

(1997), 64 Def.Couns.J. 568, 569 (arguing that application of the loss-of-chance doctrine to better-than-even cases would "allow defendants to limit damages to those actually flowing from their negligence, while at the same time allowing courts to reach results that intellectually are more credible," thereby balancing the equities between plaintiffs and medical professional defendants). Cf. Ellis,  Note, Loss of Chance as Technique: Toeing the Line at Fifty Percent (1993), 72 Tex.L.Rev. 369 (arguing that the loss-of-chance doctrine should be confined to cases presenting loss of a less-than-even chance, and in favor of an award of full damages where the patient had a greater-than-even chance of recovery).

{¶ 75} In conclusion, the trial court's determination of the facts compels the conclusion that the executor of McMullen's estate can recover damages in this case only under the *Roberts* theory of loss of less-than-even chance.  I would affirm this holding of the court of appeals.

COOK and LUNDBERG STRATTON, JJ., concur in the foregoing dissenting opinion.

_____