[Cite as *Woessner v. Toledo Hosp.*, 2016-Ohio-5764.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


Catherine Woessner, etc.                    Court of Appeals No. L-14-1260

    Appellee/Cross-Appellant              Trial Court No. CI0201201614

v.

The Toledo Hospital, et al.                 **DECISION AND JUDGMENT**

    Appellants/Cross-Appellees            Decided:  September 9, 2016

* * * * *

Jeffrey T. Stewart, Robert M. Scott and Peter D. Traska,
for appellee/cross-appellant.

John S. Wasung, Susan Healy Zitterman and Anne M. Brossia,
for appellants/cross-appellees.

Anne Marie Sferra and Sean McGlone, for amici curiae, Ohio
Hospital Association, Ohio State Medical Association and Ohio
Osteopathic Association.

* * * * *

**JENSEN, P.J.**

{¶ 1} Defendants-appellants/cross-appellees Patrick White, M.D. and Toledo

Hospital appeal from a judgment rendered against them, following a jury verdict, in a

medical malpractice wrongful death action. Plaintiff-appellee/cross-appellant Catherine Woessner, Administrator of the Estate of Brady Woessner, appeals a decision denying Woessner's motion for pre-judgement interest.

The Toledo Hospital and Dr. White assign the following errors for review:

I:  The Trial Court Erred In Denying Defendants' Motions For A Directed Verdict.

II:  The Trial Court Erred In Denying Defendants' Motion for Judgment Notwithstanding The Verdict.

III:  The Trial Court Erred In Denying Defendants' Motions To Strike Plaintiff's Proximate Cause Expert Dr. Pelletier Under Evid.R. 702(C).

IV:  The Trial Court Erred In Overruling Defendants' Objection And Instructing The Jury On Causation Theories Of Both A Traditional Wrongful Death And Lost [sic] Of Less Than Even Chance.

V:  The Trial Court Erred In Holding That The Cap On Noneconomic Damages, R.C. 2323.43, Is Unconstitutional, And Declining To Apply it Here.

VI:  The Trial Court Erred In Denying Defendants' Motion For A New Trial Or Remittitur.

2.

**{¶ 2}** Woessner assigns the following error for our review:

Plaintiff respectfully submits that the trial court erred in denying plaintiff's post-trial motion for prejudgment interest and the subsequent motion for reconsideration.

**{¶ 3}** On February 17, 2011, Brady Woessner arrived at the Toledo Hospital's emergency room complaining of severe abdominal pain. Brady revealed that he had previously been diagnosed with alpha-1 antriypsin deficiency, a genetic disorder that caused him to suffer from portal hypertension (an increase in the blood pressure within the portal vein system), cirrhosis (slow progressing disease in which healthy liver tissue is replaced with scar tissue), and esophageal varices (swollen veins in the lining of the lower esophagus).

**{¶ 4}** Various tests were performed and Brady was admitted to the hospital. The radiologist who reviewed results of a CT scan reported abnormalities in a segment of Brady's small bowel "reflective of a mechanical obstruction," but noted that ischemia (an inadequate blood supply) or inflammation were also possibilities. The radiologist reported a density change within the branches of Brady's superior mesenteric vein, the vein that transports blood out of the small intestine.

**{¶ 5}** Dr. White treated Brady conservatively—no food or drink, intravenous fluids, and a nasogastric tube—consistent with a diagnosis of a partial small bowel obstruction. While it initially appeared to Dr. White that Brady's condition was improving, Brady's health took a turn for the worse on February 22, 2011. A second CT

3.

scan was performed. The radiologist noted "extensive small bowel thickening with mild dilation. Possible cause ischemia and hemorrhage." Dr. White decided to transfer Brady to a liver transplant center for further treatment and evaluation.

{¶ 6} On February 23, 2011, Brady was transferred to the University of Michigan Health System. A third CT scan was performed. A team of University of Michigan medical professionals diagnosed a thrombus (clot) in a branch off of and into the superior mesenteric vein. The team attempted to break up the clot with thrombolytic therapy (non-surgical injection of anticoagulants into the vein), but the clot did not dissolve.

{¶ 7} On February 25, 2011, University of Michigan surgeons removed necrotic (dead tissue) portions of Brady's bowel. A second surgery removed more necrosis. Brady developed multi-system organ failure and several episodes of sepsis. On May 11, 2011, Brady was transferred to The Cleveland Clinic. He died on May 21, 2011.

{¶ 8} Catherine Woessner filed this matter alleging, in relevant part, that Dr. White was negligent and that his negligence was the direct and proximate cause of Brady's death.

{¶ 9} At trial, Dr. Todd Campbell testified that, under the applicable standard of care, Dr. White should have transferred Brady to a liver transplant facility for specialized treatment in the first 24-36 hours of his arrival at Toledo Hospital.

{¶ 10} Dr. Campbell opined that ischemia was "a cause" of Brady's death and the "main reason" Brady "ended up getting an infection and then subsequently getting sepsis, septic shock and then death." Dr. Campbell acknowledged that Brady suffered from an

4.

underlying liver disease, but indicated he did not have an opinion as to whether Brady would have survived the disease had Dr. White not breached the standard of care.

{¶ 11} Dr. Shawn Pelletier is a liver and bile duct surgeon formerly employed as the director of liver transplantation at the University of Michigan. Dr. Pelletier testified that upon Brady's arrival at the University of Michigan, he and his team determined that Brady's immediate problem was "ischemic bowel from mesenteric venous thrombosis." In other words, there was a clot in Brady's superior mesenteric vein. Dr. Pelletier explained, "the outflow of blood from the bowel through those veins was blocked off to the point the bowel * * * [was] not getting enough blood supply to stay viable, and we were worried that it had progressed to the point of having gangrene, what we would call being necrotic."

{¶ 12} Dr. Pelletier testified that he and the team tried to restore blood flow to Brady's bowel with thrombolytic therapy. The therapy, however, proved unsuccessful. The following day, Dr. Pelletier opened Brady's abdomen and removed 100 centimeters of necrotic bowel. A second surgery was later performed and additional necrotic bowel was removed.

{¶ 13} Dr. Pelletier opined that Brady had both bowel eschemia and a decompensated liver before he arrived at Toledo Hospital. He further opined that bowel necrosis was "the major cause that led to all the other problems and death." The following exchange occurred during direct examination:

5.

Q. Now, Doctor, looking at the bowel ischemia itself – and, I'm sorry, let's close the circle. You said bowel ischemia is a deadly process itself?

A. Yes.

Q. Was it a deadly process in Brady Woessner?

A. Yes.

Q. Going back to the 17th, do you have an opinion to a reasonable degree of medical probability as to whether Brady's bowel ischemia could have been successfully treated had you been able to start then rather than on the 23rd?

A. I do.

* * *

Q. What is your opinion, doctor?

A. Based on the clinical findings that when he came in, I believe that he had bowel ischemia, but it had not progressed to necrosis at that point.

Q. Do you have an opinion to a reasonable medical certainty as to whether if the treatment you wound up initiating six days later had been started six days earlier, it would more likely than not have been successful?

A. I do.

Q. And what is that opinion?

A. I believe that if early treatment was started for the bowel ischemia, there is a high likelihood of success; the process could have been reversed.

Q. Now, Doctor, Brady Woessner was a liver patient on top of that?

A. That's correct.

Q. Does that complicate his overall situation?

A. Absolutely.

Q. What are the things that can go wrong with a liver patient even if they recover or are in the process of recovering from their bowel ischemia?

A. Basically the bowel ischemia can be the process that sets off the decompensation. Many times if you can reverse whatever process it was that started the decompensation, patients go back to their baseline. So, there's some chance in Brady's case if the ischemia was reversed, he may have developed liver failure, maybe even temporary kidney failure, infections, had a long hospital stay, but ultimately, after a period of weeks or months, gone back to the state that he was at. There's also a chance that the liver failure may not have been reversible, but if he did not develop the sepsis and severe infections that ensued after that, he would have been a liver transplant candidate at that point.

* * *

Q. There's also a chance, however, that none of those things would go well, correct?

A. That is true.

Q. When you look at the whole picture, the chance that you might not succeed in treating the bowel ischemia, the chance that one of these other things might go wrong, have you tried to form an opinion that you can state to a reasonable medical probability as to what Brady's chances were of clearing all of those hurdles and being with us today?

A. I have.

Q. What is your opinion?

A. My opinion is that he had at least a 40 percent chance going through all those hurdles if therapy had been started when he initially – initially presented.

{¶ 14} Appellants moved for a directed verdict pertaining to the claim under the traditional theory of wrongful death from medical malpractice. They argued that Woessner failed to present any evidence that the alleged deviations from the standard of care proximately caused Brady's death. Appellants asserted that the matter would best be construed under the loss of less-than-even chance of recovery or survival theory first recognized in *Roberts v. Ohio Permanente Med. Group, Inc.*, 76 Ohio St.3d 483, 668 N.E.2d 480 (1996), *overruling Cooper v. Sisters of Charity of Cincinnati, Inc.*, 27 Ohio St.2d 242, 272 N.E.2d 97 (1971).

8.

**{¶ 15}** To the contrary, appellee cited *McMullen v. Ohio State Univ. Hosps.*, 88 Ohio St.3d 332, 725 N.E.2d 1117 (2000) and *Segedy v. Cardiothoracic & Vascular Surgery of Akron, Inc.*, 182 Ohio App.3d 768, 2009-Ohio-2460, 915 N.E.2d 361 (9th Dist.), for the proposition that "a plaintiff who may very well die of an underlying condition has a traditional malpractice case when discrete acts of negligence bring about the death, even though it is conceivable that death would have ensued anyway." In support of her position, appellee highlighted the following excerpt from Dr. Pelletier's direct testimony:

Q: By the time [Brady] got to the University of Michigan with active bowel necrosis as you discovered a couple of days later, do you have an opinion as to whether that active bowel necrosis contributed or – I'm sorry – was the principal reason why he wound up dying?

A: It was the major cause that led to all the other problems and death, yes.

Q: Did he have to be a liver disease patient for that to be true?

A: No.

* * *

Q: Was the liver disease an essential ingredient of his dying of his bowel ischemia?

A: Bowel ischemia alone is a deadly process.

9.

After lengthy discussion with counsel outside the presence of the jury, the trial court denied appellants' motion for directed verdict stating, "the passage of which Mr. Stewart highlighted to the Court I believe is sufficient enough to get past a directed verdict."

{¶ 16} The jury awarded a verdict in the amount of $4 million against Dr. White and White's employer, The Toledo Hospital. As part of the verdict, the jury answered several interrogatories. In these interrogatories, the jury found that Dr. White was negligent and that his negligence was a direct and proximate cause of the death of Brady Woessner. The jury was instructed, because of its proximate cause conclusion, to skip the interrogatory addressing the loss of less-than-even chance of recovery or survival theory (often referred to as the "lost chance" theory).

{¶ 17} The general verdict form was journalized by the trial court on February 18, 2014. The trial court denied Woessner's motion for pre-judgment interest and a subsequent motion to reconsider the denial.

{¶ 18} This appeal and cross-appeal followed.

{¶ 19} Under their first assignment of error, appellants assert that the trial court erred when it denied their motion for directed verdict on the traditional medical malpractice wrongful death claim. The crux of their argument is that Woessner failed to offer sufficient evidence to allow reasonable minds to differ as to whether Dr. White's alleged breach of the standard of care proximately caused the death of Brady Woessner.

{¶ 20} "A motion for directed verdict * * * does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and

10.

consider the evidence." *O'Day v. Webb*, 29 Ohio St.2d 215, 280 N.E.2d 896 (1972), paragraph three of the syllabus. Because we are presented with a question of law, we apply a de novo standard of review. *White v. Leimbach*, 131 Ohio St.3d 21, 2011-Ohio-6238, 959 N.E.2d 1033, ¶ 1.

{¶ 21} When a trial court rules on a directed verdict motion, it must not consider either the weight of the evidence or witness credibility. *See Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679-80, 693 N.E.2d 271 (1998); *Wagner v. Roche Laboratories*, 77 Ohio St. 3d 116, 671 N.E.2d 252 (1996); *Strother v. Hutchinson*, 67 Ohio St.2d 282, 284, 423 N.E.2d 467 (1981). Instead, a directed verdict motion tests the legal sufficiency of the evidence. *See Eldridge v. Firestone Tire & Rubber Co.*, 24 Ohio App.3d 94, 96, 493 N.E.2d 293 (1985). "'If there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied.'" *Strother* at 284-285, quoting *Hawkins v. Ivy*, 50 Ohio St.2d 114, 115, 363 N.E.2d 367 (1977) (citation omitted); *see also Texler*. The Civ.R. 50(A)(4) "reasonable minds" test "calls upon the court only to determine whether there exists any evidence of substantial probative value in support of [the nonmoving party's claims]." *Wagner* at 119-120; see also *Texler* at 679-80; *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68-69, 430 N.E.2d 935 (1982).

{¶ 22} In order to prove traditional medical malpractice, the plaintiff has the burden of demonstrating, by a preponderance of the evidence, that the defendant

11.

breached the standard of care owed to the plaintiff and that the breach proximately caused an injury. *Segedy*, 2009-Ohio-2460 at ¶ 11, citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976), paragraph one of the syllabus.

{¶ 23} Expert testimony with respect to proximate cause must be stated in terms of probability. *Stinson v. England*, 69 Ohio St.3d 451, 633 N.E.2d 532 (1994), paragraph one of the syllabus. "In a medical malpractice action premised on a failure to properly diagnose or treat a medical condition which results in a patient's death, the proper standard of proof on the issue of causation is whether with proper diagnosis and treatment the patient probably would have survived." *Miller v. Paulson*, 97 Ohio App.3d 217, 222, 646 N.E.2d 521 (10th Dist.1994). "'Probably' is defined as 'more likely than not' or a greater than fifty percent chance." Id.

{¶ 24} In the present case, the parties do not dispute there was sufficient evidence produced at trial to demonstrate that Dr. White breached his duty of care. Appellee presented testimony from Dr. Campbell that Dr. White should have transferred Brady to a liver transplant facility for specialized treatment in the first 24-36 hours of arrival at Toledo Hospital. However, in order to proceed under the traditional theory of medical malpractice, appellee was also required to demonstrate a causal link between the breach and Brady's death. Because of the complications involved with Brady's underlying liver disease, expert testimony that the ischemia was "the principal reason" Brady "wound up dying" is not sufficient. On this point, appellee's causation expert, Dr. Pelletier, testified

12.

that Brady had "at least a 40 percent chance" of survival if thrombolytic therapy had been initiated when he initially presented at Toledo Hospital.

{¶ 25} Here, the issue is whether the evidence warranted a directed verdict on the traditional medical malpractice claim that would have allowed the trial to continue on the lost chance theory only. As stated above, in a traditional medical malpractice claim, proximate cause must be established by a probability. The loss-of-chance theory, however, is an exception to "the traditionally strict standard of proving causation in a medical malpractice action." *Roberts*, 76 Ohio St.3d at 485.

{¶ 26} Appellee argues "the testimony established that bowel ischemia is a disease independent of liver disease; that it can occur and kill without any liver disease being present; and that more likely than not, Mr. Woessner's bowel ischemia would have been reversed had treatment not been delayed." While the foregoing is an accurate representation of a portion of Dr. Pelletier's testimony, it ignores the doctor's qualifying testimony on direct examination explaining the unique complications presented by Brady's underlying liver disease. Notably, Dr. Pelletier testified that the ischemia—even if diagnosed and treated properly—could have started the decompensation (failure) of Brady's liver. "Many times," Dr. Pelletier explained, "you can reverse whatever process it was that started the decompensation, patients go back to their baseline." While Dr. Pelletier explained there was a chance that Brady "after a period of weeks or months" could have gone back to the state he was in before the ischemia, there was also "a chance that the liver failure may not have been reversible." If the liver failure was reversible and

13.

had Brady not developed sepsis, he would have been a liver transplant candidate with a good chance of survival. There was a third possibility, however, and that was "that none of those things would go well." So, when "look[ing] at the whole picture," Dr. Pelletier opined, Brady "had at least a 40 percent chance going through all those hurdles if therapy had been started when he initially * * * presented."

{¶ 27} We disagree with appellee's assertion that Dr. Pelletier's testimony was sufficient for a jury to determine that Dr. White's "negligence was the proximate cause of the harm" and that the "failure to diagnose and treat the bowel ischemia was as much an independent cause of death as the mishandling of the endotracheal tube in *McMullen*."

{¶ 28} In fact, when reviewed in its entirety, Dr. Pelletier's testimony proves this case to be exactly what appellants' counsel argued at trial: a lost chance case and not a case where the evidence is sufficient to meet the elements of a traditional medical malpractice claim. In *McMullen*, Justice Alice Robie Resnick explained:

> In reviewing the many cases on the subject, a particular factual situation is discernible to which the [lost chance] doctrine is invariably applied. In those cases, the plaintiff or the plaintiff's decedent is already suffering from some injury, condition, or disease when a medical provider negligently diagnoses the condition, fails to render proper aid, or provides treatment that actually aggravates the condition. As a result, the underlying condition is allowed to progress, or is hastened, to the point where its inevitable consequences become manifest. Unable to prove that the

14.

provider's conduct is the direct and the only cause of the harm, the plaintiff relies on the theory that the provider's negligence at least increased the risk of injury or death by denying or delaying treatment that might have inured to the victim's benefit. The focus then shifts away from the cause of the ultimate harm itself, and is directed instead on the extent to which the defendant's negligence caused a reduction in the victim's likelihood of achieving a more favorable outcome. (Citations omitted.) *McMullen*, 88 Ohio St.3d at 338.

{¶ 29} In order to survive a motion for directed verdict on a traditional medical malpractice claim alleging a failure to properly diagnose and treat Brady's blood clot, Woessner was required to present sufficient evidence that but for the alleged negligence, Brady had a greater than fifty percent chance of survival. In examining the trial testimony, the only evidence produced on the issue of proximate cause was Dr. Pelletier's testimony that Brady had "at least a 40 percent chance" of survival if the blood clot had been diagnosed and treatment had been initiated upon arrival at Toledo Hospital. Dr. Pelletier's testimony, when taken in its entirety, failed to establish Brady had a greater than 50 percent chance of survival. After construing the evidence in a light most favorable to the appellee, we find there did not exist evidence of substantive probative value to create a factual question for the jury on the issue of proximate cause in appellant's traditional malpractice claim. For this reason, the trial court erred in overruling a directed verdict in favor of Dr. White on that claim.

15.

{¶ 30} Appellants' first assignment of error is found well-taken. The remaining assignments of error and cross-assignment of error are moot, and we decline to address them. *See* App.R. 12(A)(1)(c). The judgment of the Lucas County Court of Common Pleas is reversed and the cause remanded for further proceedings consistent with this decision. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Arlene Singer, J.

_____
JUDGE

James D. Jensen, P.J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.

16.