[Cite as *Geesaman v. St. Rita's Med. Ctr.*, 183 Ohio App.3d 555, 2009-Ohio-3931.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

GEESAMAN ET AL.,

    APPELLANTS,                    CASE NO.  1-08-65

    v.

ST. RITA'S MEDICAL CENTER ET AL.,       O P I N I O N

    APPELLEES.


**Appeal from Allen County Common Pleas Court**
**Trial Court No. CV2006 0914**

**Judgment Affirmed in Part, Reversed in Part, and Cause Remanded**

**Date of Decision:   August 10, 2009**


APPEARANCES:

    **Dennis P. Mulvihill, for appellants.**

    **James F. Nooney, for appellee Ali Almudallal, M.D.**

    **Patrick K. Adkinson, for appellees John Cox, M.D. and Lima Radiology.**

**SHAW, Judge.**

{¶1} Plaintiffs-appellants, Jeffrey and Lori Geesaman, appeal the October 1, 2008 judgment of the Common Pleas Court of Allen County, Ohio, entering a judgment for the defendants-appellees, Dr. John Cox, Lima Radiology Associates, and Dr. Ali Almudallal, and dismissing the Gessamans' complaint following a jury verdict in favor of the appellees.

{¶2} The facts relevant to this appeal are as follows. On March 31, 2005, Jeffrey Geesaman went to the emergency room at St. Rita's Medical Center, where he saw Dr. Gary Beasley. Mr. Geesaman reported that he was experiencing dizziness, balance issues, slurred speech, and problems with his vision and had vomited three times throughout the day. His blood pressure was taken at the time, and it was 171/111 and later reached 184/117. His weight was 280 pounds, and he was 6' 1" tall. Mr. Geesaman also provided a history to medical personnel, which included poorly controlled hypertension, smoking, and alcohol consumption. Mr. Geesaman further stated that he had quit smoking and consuming alcohol a number of years prior. In addition, he reported that his mother had had a stroke at age 45.

{¶3} Dr. Beasley conducted a physical exam of Mr. Geesaman in order to determine the cause of his symptoms and found no signs of trauma to his head. Dr. Beasley did not have Mr. Geesaman stand up or walk because of his size and complaints of dizziness and balance problems. Mr. Geesaman was placed on a

heart monitor, and a chest x-ray and CT scan of his head were taken, as well as other tests. The chest x-ray and physical examination were negative for any cardiac problems. The CT scan did not show any kind of bleed or tumor that could explain the symptoms. However, Mr. Geesaman's sugar level was elevated at 224.

{¶4} After reviewing the various tests and conducting his own examination, Dr. Beasley was concerned that Mr. Geesaman might have had a stroke or was experiencing a transient ischemic attack ("TIA"). As a result, Dr. Beasley, who is an emergency-medicine physician, contacted neurologist, Dr. Ali Almudallal, to discuss the case and his concerns. After discussing the case, the decision was made to have Mr. Geesaman admitted to internal medicine, and Dr. Almudallal would provide a neurological consult.

{¶5} That evening, Mr. Geesaman was admitted to the hospital and placed on a number of different medications, including aspirin. The following day, Dr. Almudallal ordered several tests for Mr. Geesaman, including magnetic resonance imaging ("MRI") of his brain, in order to determine whether he had had a stroke. An MRI of the brain involves the taking of hundreds of images in various sequences, including diffusion-weighted images. The MRI was reviewed by Dr. John Cox, a neuroradiologist. Dr. Cox concluded that the MRI was normal and wrote that conclusion in his report. After reading the conclusion of Dr. Cox, as well as the results of the other tests, Dr. Almudallal ruled out a stroke.

**{¶6}** Mr. Geesaman's condition seemed to improve, and Dr. Almudallal determined that his neurological problems were possibly caused by either a complicated migraine or labyrinthitis, an inflammation in the inner ear. Therefore, Dr. Almudallal discharged Mr. Geesaman from his neurological care. Prior to discharging Mr. Geesaman from neurology, Dr. Almudallal spoke with him and his wife about his conclusions and decided to see him on an outpatient basis to provide additional workup for these possible conditions. In addition, Dr. Almudallal testified that he told Mr. Geesaman to continue taking aspirin every day. However, the Geesamans testified that Dr. Almudallal never gave that instruction.

**{¶7}** Mr. Geesaman remained in the hospital for another day because of other issues, including his hypertension and his newly discovered diabetes, which were being treated by the internal-medicine physicians. On April 2, 2005, Mr. Geesaman was discharged from the hospital. Prior to that discharge, he was given discharge instructions and five prescriptions, neither of which involved his taking aspirin. Upon leaving the hospital, Mr. Geesaman did not take any additional aspirin.

**{¶8}** For the next three days, Mr. Geesaman seemed to be improving. However, on April 5, 2005, Mr. Geesaman returned to St. Rita's emergency room. This time he and his wife reported that his slurred speech had increased and he was off balance, had difficulty walking, was confused, had right-sided weakness,

and loss of appetite, and was very tired. Once again, Mr. Geesaman was admitted to the hospital, and another MRI of his brain was ordered in addition to other tests. Included in the other tests was a magnetic resonance angiogram ("MRA"). An MRA uses a magnetic field to provide pictures of blood vessels inside the body. In this case, the MRA was utilized to determine whether any abnormalities in Mr. Geesaman's vessels, such as a blood clot, existed that could explain his symptoms.

{¶9} This second MRI revealed that Mr. Geesaman had suffered a stroke. In addition, the doctors treating Mr. Geesaman realized that his first MRI had shown that he had a stroke. In fact, two to three infarcts, dead tissue caused by a stroke, were visible in the April 1, 2005 MRI. Those infarcts went unnoticed, however, because Dr. Cox failed to view the diffusion-weighted images of the MRI. Diffusion-weighted images are helpful to identify an area of acute ischemia in the brain—i.e., a restriction in blood supply, which would indicate a recent stroke. In this case, these images showed damage to the portions of the brain located in the back of the head, known as the pons and the cerebellum. Problems in these parts of the brain were consistent with the symptoms Mr. Geesaman was experiencing when he came to the hospital the first time.

{¶10} Mr. Geesaman remained in the hospital until April 13, 2005, when he was transferred to the rehabilitation facility at St. Rita's. He remained in rehabilitation until he was discharged to his home on May 11, 2005. As a result of

the strokes, he suffered brain damage, leaving him permanently disabled and unable to care for himself.

{¶11} On September 13, 2006, the Geesamans filed a complaint for medical malpractice and loss of consortium against Dr. Almudallal, Dr. Cox, and several others. The case proceeded through the discovery phase with the parties deposing several doctors on behalf of each, and various parties being dismissed. Among those deposed was Dr. Charles Lanzieri, a neuroradiologist. Dr. Lanzieri was listed as an expert witness for the Geesamans.

{¶12} During discovery, Dr. Cox admitted that he breached the standard of care by failing to review the diffusion-weighted images of the MRI.[1] Ultimately, the case proceeded to trial against Dr. Almudallal, Dr. Cox, and Lima Radiology Associates.[2] Prior to the trial, the Geesamans filed a motion in limine, asking the court to exclude any evidence of Mr. Geesaman's prior drug and alcohol usage.

---

[1] The parties dispute the reason for Dr. Cox's breach of duty. Dr. Cox maintained that the images did not appear when he accessed Mr. Geesaman's MRI in the computer due to some problem with the system. However, witnesses for the plaintiffs testified that the system was working properly, and the images were available for review when Dr. Cox accessed Mr. Geesaman's MRI. In any event, Dr. Cox admitted that he should have reviewed these images and that his failure to recognize that the images were not available and to examine them prior to determining the MRI was normal was a breach of the standard of care.

[2] The complaint names Lima Radiology Associates ("LRA") under the doctrine of respondeat superior as the employer of Dr. Cox or that Dr. Cox was the owner of LRA. However, LRA's liability under the doctrine of respondeat superior was not a question before the jury because LRA admitted in its answer to the plaintiffs' complaint that Dr. Cox was its employee at the time of Mr. Geesaman's injury and was acting within the scope of that employment when he examined Mr. Geesaman's MRI and concluded that the MRI was normal. LRA denied, however, that Dr. Cox was negligent and/or that he caused the plaintiffs' injuries. Given these admissions and denials, LRA's liability was dependent upon the jury's verdict as to Dr. Cox. In accordance with the jury's verdict as to Dr. Cox, the judgment entry on the jury's verdict indicates that both Dr. Cox and LRA were dismissed pursuant to the verdict. Because LRA's liability is dependent solely upon the liability of Dr. Cox, throughout this opinion our rulings on the assignments of error as to Dr. Cox also apply to LRA.

The court overruled this motion. Additionally, Dr. Cox filed a motion in limine, requesting that the Geesamans not be permitted to introduce any evidence or make any argument to the jury as to loss of a less-than-even chance of recovery. The trial court granted this request and ordered that the Geesamans were "foreclosed from bringing forth any evidence with a focus on Loss of Chance."

{¶13} On September 15, 2008, the trial in this matter began. Over the next several days, the parties presented their respective cases. One of the experts utilized by the Geesamans was Dr. David Thaler, a neurologist. He testified, inter alia, that had the stroke that Mr. Geesaman suffered on March 31, 2005, been recognized, the condition that caused that stroke identified, and Mr. Geesaman properly treated, he more likely than not would not have suffered the second stroke on April 5, 2005, which left him disabled. Counsel for the Geesamans also called Dr. Almudallal to testify as upon cross-examination. During this testimony, Dr. Almudallal opined that with proper care during Mr. Geesaman's first admission, he would have had a 25 to 33 percent chance of avoiding the second stroke.

{¶14} Dr. Cox's expert in neurology, Dr. Howard Kirshner, testified that even if the first stroke had been detected, the condition that caused the stroke identified, and Mr. Geesaman properly treated, he more likely than not would have suffered the second stroke. However, he also testified that there are studies that

have shown that with proper treatment, particularly utilizing aspirin, there is a 13 to 20 percent chance of avoiding a second stroke.

{¶15} Dr. Almudallal also presented the expert testimony of Dr. David Preston, a neurologist. In respect to causation, Dr. Preston testified that no treatment option would have prevented Mr. Geesaman's second stroke to a reasonable degree of medical certainty. This testimony was based, in part, upon a meta-analysis of 13 clinical trials involving stroke treatment utilizing aspirin. That analysis found that patients who were treated with aspirin had an 8.3 percent chance of having another stroke, whereas patients who were not treated had a 10 percent chance of having another stroke. These numbers correlated to a 17 percent relative risk reduction for a second stroke in patients who were treated with aspirin and an absolute risk reduction of 1.7 percent.

{¶16} At the conclusion of all the evidence, the trial court provided the jury with instructions, interrogatories, and verdict forms. Included in the instructions was an instruction about comparative negligence. After deliberations, the jury answered the necessary interrogatories and returned verdicts in favor of Dr. Almudallal and Dr. Cox. Specifically, the jury found that Dr. Almudallal was not negligent. It also found that Dr. Cox's negligence, which was conceded at trial, did not proximately cause injury to Mr. Geesaman. In accordance with these verdicts, the trial court rendered judgment in favor of the doctors and dismissed the Geesamans' complaint.

{¶17} The Geesamans now appeal, asserting six assignments of error.

### Assignment of Error No. 1

The trial court erred when it excluded appellants' loss-of-chance theory of recovery from trial.

### Assignment of Error No. 2

The trial court erred when it refused to charge the jury on the loss-of-chance theory of recovery.

### Assignment of Error No. 3

The trial court erred when it charged the jury on appellant Jeffrey Geesaman's comparative negligence.

### Assignment of Error No. 4

The trial court erred when it admitted evidence of appellant Jeffrey Geesaman's prior drug use.

### Assignment of Error No. 5

The trial court erred when it admitted Dr. Lanzieri's deposition into evidence at trial.

### Assignment of Error No. 6

The trial court erred when it admitted testimony from Dr. Preston in contravention of its own order regarding two MRIs taken of Jeffrey Geesaman's brain.

{¶18} For ease of discussion, we elect to address the assignments of error out of order.

*Second Assignment of Error*

{¶19} In their second assignment of error, the Geesamans maintain that the trial court erred when it failed to instruct the jury on the issue of loss of chance. Initially, we note that this assignment or error involves the causation element of a medical malpractice action, not issues of duty and a breach thereof—i.e., negligence. The jury found that Dr. Almudallal was not negligent, and accordingly, never proceeded to the causation inquiry. Therefore, this assignment of error does not apply to the verdict rendered in favor of Dr. Almudallal, and we address this issue only as it applies to Dr. Cox.

{¶20} In general, requested instructions should be given if they are correct statements of the law applicable to the facts in the case and reasonable minds might reach the conclusion sought by the instruction. *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E. 2d 828. "In reviewing a record to ascertain the presence of sufficient evidence to support the giving of a[n] * * * instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." Id., citing *Feterle v. Huettner* (1971), 28 Ohio St.2d 54, 275 N.E.2d 340, at syllabus. In reviewing the sufficiency of jury instructions given by a trial court, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case. *State v. Wolons* (1989), 44 Ohio St.3d 64, 68, 541 N.E.2d 443. The term "abuse of discretion" implies that

the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶21} Here, the issue is whether the evidence warranted an instruction on loss of chance. The loss-of-chance theory, more appropriately referred to as "loss of a less-than-even chance," was first recognized as a method of recovery in a medical malpractice action in Ohio in 1996. See *Roberts v. Ohio Permanente Med. Group, Inc.* (1996), 76 Ohio St.3d 483, 668 N.E.2d 480. The plaintiff in *Roberts* was the executor of the estate of a patient who had died from lung cancer. Id. at 484. The defendants failed to diagnose and properly treat the patient's lung cancer for 17 months. Id. The plaintiff presented evidence that the decedent would have had a 28 percent chance of survival had proper and timely care been rendered but that the defendants' negligence had decreased that chance of survival to zero. Id. After reviewing the loss-of-chance theory and Ohio's prior treatment of this theory, the court held:

> In order to maintain an action for loss of a less-than-even chance of recovery or survival, the plaintiff must present expert medical testimony showing that the health care provider's negligent act or omission increased the risk of harm to the plaintiff. It then becomes a jury question as to whether the defendant's negligence was a cause of the plaintiff's injury or death. Once that burden is met, the trier of fact may then assess the degree to which the plaintiff's chances of recovery or survival have been decreased and calculate the appropriate measure of damages. The plaintiff is not required to establish the lost chance of recovery or survival in an exact percentage in order for the matter to be submitted to the jury.

Id. at 488, 668 N.E.2d at 484. In so holding, the Ohio Supreme Court expressly overruled its prior holding in *Cooper v. Sisters of Charity of Cincinnati, Inc.* (1971), 27 Ohio St.2d 242, 251-252, 56 O.O.2d 146, 272 N.E.2d 97. Id.

{¶22} In *Cooper*, the decedent, a 16-year-old boy, was struck by a truck while riding a bicycle and hit his head. *Cooper*, 27 Ohio St.2d 242. The emergency-room physician failed to conduct a proper examination, thus missing his skull fracture and welling of the tissues in the back of his head. Id. at 243-245. The doctor sent him home, and the boy died early the next morning from his injuries. Id.

{¶23} The executor of the boy's estate brought suit and presented two experts. Id. at 245-248. One doctor, who performed the decedent's autopsy, stated that it was difficult to ascertain with any degree of certainty whether the decedent would have survived or died with proper treatment. Id. at 247. The other doctor testified that proper diagnosis and surgery would have placed the boy's chances for survival around 50 percent. Id. The trial court granted the defendants a directed verdict, finding that the plaintiff had failed to establish proximate cause between the defendants' negligence and the boy's death. Id. at 248-249. In affirming this decision, the Supreme Court of Ohio rejected the loss-of-chance theory and permitted recovery in a medical malpractice action only under a traditional proximate-cause standard—i.e., when the plaintiff could prove

that the negligence of the tortfeasor was more probably than not the proximate cause of the death and/or injury of the patient. Id. at syllabus.

{¶24} In *Roberts*, the court reexamined the loss-of-chance theory and the views expressed in *Cooper*. *Roberts*, 76 Ohio St.3d at 487. The court then held that it could "no longer condone this view" and overruled *Cooper*. Id. at 488. In explaining its decision, the court stated: "Rarely does the law present so clear an opportunity to correct an unfair situation as does this case before us. The time has come to discard the traditionally harsh view we previously followed." Id. The court also declared that "[a] patient who seeks medical assistance from a professional caregiver has the right to expect proper care and should be compensated for any injury caused by the caregiver's negligence which has reduced his or her chance of survival." Id. The court went on to discuss the advancements seen in the medical field and the importance of early intervention and held that "a health care provider should not be insulated from liability where there is expert medical testimony showing that he or she reduced the patient's chances of survival." Id.

{¶25} During the trial in this case, the Geesamans presented the testimony of Dr. David Thaler, who concluded that Mr. Geesaman's second, more devastating stroke and its attendant injuries more likely than not could have been avoided but for the errors made in failing to identify the first stroke and treating him properly. Dr. Almudallal testified as upon cross-examination that Mr.

Geesaman's chances of avoiding that second stroke were 25 to 33 percent if he had been properly treated after his first stroke. Dr. Kirshner, in testifying for Dr. Cox, acknowledged that some studies have shown that with proper treatment, such as the use of aspirin, there is a 13 to 20 percent chance to avoid a second stroke. Lastly, Dr. Preston, in testifying for Dr. Almudallal, stated that a meta-analysis of 13 different studies involving stroke treatment with aspirin demonstrated a 17 percent relative risk reduction and 1.7 percent absolute risk reduction for having a second stroke.

{¶26} On these facts, the evidence before the jury was sufficient that reasonable minds might reach the conclusion sought by a loss of less-than-even chance of recovery instruction. This evidence was introduced initially by the Geesamans through the use of cross-examination of Dr. Almudallal in their case-in-chief and was further brought about during the presentation of expert witnesses for the respective defenses. Although Dr. Thaler provided testimony to establish proximate causation, witnesses for the two defendant doctors and Dr. Almudallal himself provided the evidence that warranted a loss of less-than-even chance instruction.

{¶27} Nevertheless, Dr. Cox maintains that the loss of less-than-even chance theory should not be forced upon the defense because the Geesamans proceeded under a proximate cause theory of their case in their complaint. In support, Dr. Cox relies upon another Ohio Supreme Court case, *McMullen v. Ohio*

*State Univ. Hosps.* (2000), 88 Ohio St.3d 332, 725 N.E.2d 1117. In *McMullen*, the plaintiff's decedent suffered from cancer, had a bone marrow transplant, and later returned to the hospital with high fevers and a possible viral infection. Id. at 333. The decedent's lungs had fluid buildup, and she experienced shortness of breath, leading to the placement of an endotracheal ("ET") tube through her mouth and throat in order to maintain her oxygenation level. Id. Three days later, on October 14, 1990, her oxygen-saturation level dropped to a critical point, and when other efforts failed to improve this level, the nurses removed her ET tube. Id. It took the responding doctors several different attempts in excess of 20 minutes before the ET tube was successfully reestablished. Id. During this time, the decedent's oxygen-saturation level fell below that consistent with life, causing the decedent irreversible damage to her brain, lungs, and heart. Id. She died seven days later. Id.

{¶28} During a trial to the court, the plaintiff presented evidence that this event was the direct cause of all the underlying causes of the decedent's death. *McMullen*, 88 Ohio St.3d at 334. The defendants presented evidence that prior to the October 14, 1990 incident, the decedent's chances of survival were less than 50 percent, given her overall condition and that she would have died within 30 days, notwithstanding the events on October 14th. Id. at 335.

{¶29} The trial court found that the decedent had a chance of surviving prior to October 14, 1990, but that the negligent medical treatment decreased her

chance of survival to zero. Id. The court found in favor of the decedent's estate but then conducted a trial on the issue of damages and applied the formula for the calculation of damages based upon a lost chance of survival rather than a total amount of damages. Id.

{¶30} The Supreme Court found that the trial court should never have proceeded to assess damages under a loss-of-chance theory, given the trial court's conclusion that the cause of death was the October 14, 1990 anoxic or hypoxic event, attributed solely to the defendants' negligence. Id. at 337. Specifically, the court held that it "never intended to force this theory on a plaintiff who could otherwise prove that specific negligent acts of the defendant caused the ultimate harm."

{¶31} Further, the court noted that a review of the many cases on loss of less-than-even chance revealed a particular factual situation involved:

> [T]he plaintiff or the plaintiff's decedent [was] already suffering from some injury, condition, or disease when a medical provider negligently diagnoses the condition, fails to render proper aid, or provides treatment that actually aggravates the condition. As a result, the underlying condition is allowed to progress, or is hastened, to the point where its inevitable consequences become manifest.

Id. The court then found that the case before it was different in that the ultimate harm was directly caused by the defendants' negligence rather than by their negligence combining with the decedent's preexisting condition. Id. at 341. Thus,

the court concluded that the trial court should not have applied the loss of less-than-even chance theory.

{¶32} The situation before us is akin to the cases reviewed by the Supreme Court in *McMullen*, wherein a medical provider's negligence combined with Mr. Geesaman's preexisting condition to lead to the injury, rather than to the actual facts of *McMullen*. The holding in *McMullen* was designed to prevent a tortfeasor from escaping full liability when the person the tortfeasor negligently injured happened to also suffer from some preexisting condition. However, in this case, no one alleged that Dr. Cox did something to directly cause Mr. Geesaman to have a stroke, but instead, that he failed to recognize the first stroke, which led to a lack of proper treatment to prevent the second stroke.

{¶33} Once again, the entire premise of the loss of less-than-even chance of recovery/survival is that doctors and other medical personnel should not be allowed to benefit from the uncertainty of recovery/survival that their negligence has created. See *Roberts*, 76 Ohio St.3d at 486-487. Moreover, " '[w]hen those preexisting conditions have not absolutely preordained an adverse outcome, however, the chance of avoiding it should be appropriately compensated even if that chance is not better than even.' " *Roberts*, 76 Ohio St.3d at 487, quoting King, Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences (1981), 90 Yale L.J. 1353, 1354.

{¶34} For these reasons, the jury should have been instructed on the loss of less-than-even chance theory of recovery. Although the Geesamans presented testimony that Mr. Geesaman's chance to avoid the second stroke and resultant injuries was more probable than not with proper diagnosis and treatment, other evidence could have led a reasonable juror to conclude that Mr. Geesaman had a less-than-even chance to avoid the second stroke and resultant injuries. Therefore, if the jury did not find proximate cause, the evidence warranted instructing them to consider loss of chance, not as a fallback position for the Geesamans, as Dr. Cox asserts, but based upon the evidence before it. Thus, the trial court abused its discretion in unreasonably refusing to instruct the jury on this issue when the evidence clearly supported it. For these reasons, the second assignment of error is sustained.

*First Assignment of Error*

{¶35} The Geesamans assert in their first assignment of error that the trial court erred in excluding the loss of less-than-even chance of recovery during their case-in-chief. Although we fail to find any legal obstacle in Ohio law for the Geesamans to have pursued both the traditional notion of proximate causation and the relaxed causation standard of loss of less-than-even chance, especially in light of the Supreme Court's decision in *Roberts* to expressly overrule *Cooper*, we need not decide this issue here, given the actual development of the evidence at trial, which clearly warranted the requested jury instruction on loss of less-than-even

chance in any event, as discussed in the determination of the second assignment of error. Therefore, the first assignment of error is moot and, consequently, overruled.

*Third Assignment of Error*

{¶36} In their third assignment of error, the Geesamans contend that the trial court abused it discretion when it gave the jury an instruction on comparative negligence. The jury was given eight interrogatories by the trial court at the conclusion of its instructions. The fourth and fifth interrogatories addressed the issue of comparative negligence. However, the jury was to answer these interrogatories only if it found Dr. Almudallal negligent and that his negligence had proximately caused injury to Mr. Geesaman or if it found that Dr. Cox's admitted negligence had proximately caused injury to Mr. Geesaman. Because the jury did not find Dr. Almudallal negligent and did not find that Dr. Cox's negligence had proximately caused injury to Mr. Geesaman, the issue of whether Mr. Geesaman was comparatively negligent was never reached. Therefore, this assignment of error is moot, and consequently, overruled.

*Fourth Assignment of Error*

{¶37} The Geesamans next maintain that the trial court erred in permitting evidence of Mr. Geesaman's prior drug use to be introduced at trial. In reviewing this assignment of error, we first note that "[t]he admission of evidence is generally within the sound discretion of the trial court, and a reviewing court may

reverse only upon the showing of an abuse of that discretion." *Peters v. Ohio State Lottery Comm.* (1992), 63 Ohio St.3d 296, 299, 587 N.E.2d 290. As previously noted, the term "abuse of discretion" connotes a judgment that is rendered with an unreasonable, arbitrary, or unconscionable attitude. *Blakemore*, 5 Ohio St.3d at 219, 450 N.E.2d 1140.

{¶38} In the case sub judice, the medical records of Mr. Geesaman included a reference to prior drug use. One such reference was included in a letter to Dr. Stephen Sandy, Mr. Geesaman's primary physician, from Matthew P. Ziccardi, Psy.D. Dr. Ziccardi conducted a neuropsychological consult on Mr. Geesaman on June 7, 2005, and wrote a letter to Dr. Sandy regarding his examination, impression, and recommendations. Included in this letter was the following statement: "His medical and psychiatric histories are notable for an extensive history of polysubstance abuse, including alcohol, barbiturates, injected drugs, and inhalants."

{¶39} Prior to trial, the Geesamans filed a motion in limine to exclude any reference to prior drug use by Mr. Geesaman. The trial court overruled this motion, stating:

> It's common knowledge the effect of these particular items. * * * You don't start with, okay, he had a stroke. It has to do with everything; if there is any link or how a person conducted their life. It didn't start at that event. And if a person had taken drugs once or twice that's one thing. But if they've taken it for a number of times over a number of years the court believes that it does have probative value and it is not prejudicial and would allow reference to the same.

After this ruling, counsel for Dr. Cox commented in opening statement that Mr. Geesaman had a fairly lengthy history of substance abuse. In response, Lori Geesaman testified that she had known her husband since 1992, that they were married in 1996, and that she had never known him to have taken any illegal drugs.

{¶40} The trial court admitted the letter from Dr. Ziccardi as a part of Dr. Almudallal's Exhibit A.[3] During closing statements, counsel for Dr. Almudallal placed several items on a screen in his discussion of damages to show the jurors regarding Mr. Geesaman's failure to follow through with medical advice, the number of risk factors that he had and ignored, and his overall failure to attend to his own health. In these images, he included the letter from Dr. Ziccardi. He directed the jurors' attention to a portion of the letter, which he highlighted, involving Mr. Geesaman's denial of any cognitive or emotional changes related to his stroke. However, immediately preceding this sentence was the sentence concerning Mr. Geesaman's history of polysubstance abuse, which was also underlined.

{¶41} Evidence Rule 402 provides, "All relevant evidence is admissible, except as otherwise provided." Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the

---

[3] Although the Geesamans did not object to the admission of this exhibit as a whole, they did object to any references to prior drug usage, preserving this issue for appeal.

determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevant evidence is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403.

{¶42} Here, there was no evidence that any drug use, if shown, was relevant to the issues before the jury. There was no testimony showing any causal connection between Mr. Geesaman's drug use, his stroke, and the resultant damages. Thus, this topic did not have any tendency to make the existence of any fact of consequence more or less probable. Moreover, even assuming arguendo that there was some relevance to past drug use, its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the juror. In fact, the trial court's own statement, noted above, evidences these problems as it appears to have been misled by the evidence of prior drug use and confused as to the issue. Thus, the trial court should not have allowed this evidence and abused its discretion in allowing it.

{¶43} However, while the trial court erred in admitting evidence of prior drug use, we cannot find that the trial court's decision, given the limited nature and reference to this evidence by the parties, affected the outcome of the trial so as to rise to the level of reversible error. Therefore, this assignment of error is overruled.

*Fifth Assignment of Error*

{¶44} The Geesamans assert in their fifth assignment of error that the trial court erred when it admitted the deposition of Dr. Charles Lanzieri, a neuroradiologist, into evidence during the trial. As an initial matter, we note that the testimony of Dr. Lanzieri involved the standard of care of radiologists and causation. Given the jury's finding that Dr. Almudallal was not negligent, this assignment of error does not apply to the verdict rendered in favor of him. Thus, we address this issue only as it applies to Dr. Cox.

{¶45} During the discovery phase of this case, the Geesamans listed Dr. Lanzieri as one of their experts. As a result, a deposition of Dr. Lanzieri was conducted on June 23, 2008, and all counsel present questioned Dr. Lanzieri to varying degrees.[4] At trial, the Geesamans elected not to present Dr. Lanzieri as a witness in their case-in-chief. However, counsel for Dr. Cox introduced the deposition of Dr. Lanzieri during the presentation of Dr. Cox's case. The Geesamans objected to the use of the deposition for a number of reasons. The trial court overruled these objections, and the deposition in its entirety was then read into the record.

{¶46} The use of depositions at trial is governed by Civ.R. 32. This rule states:

> At the trial * * * any part or all of a deposition, *so far as admissible under the rules of evidence* applied as though the witness were then

---

[4] At this point in the litigation, St. Rita's Medical Center was a defendant. Counsel for the hospital was present at Dr. Lanzieri's deposition and also questioned him. The hospital was dismissed prior to trial.

> present and testifying, may be used against any party who was present or represented at the taking of the deposition * * * in accordance with any one of the following provisions * * *
>
> The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: * * * (e) that the witness is an attending physician or medical expert, although residing within the county in which the action is heard * * * or (g) upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.

Civ.R 32(A)(3). In cases involving medical malpractice, a person giving expert testimony on the issue of liability must be licensed to practice medicine by the licensing authority of any state and devote at least 50 percent of his/her professional time to active clinical practice in his/her licensed field or to teaching it at an accredited school. Evid.R. 601(D).

{¶47} In this case, Dr. Lanzieri qualified as a medical expert in radiology. Therefore, Civ.R. 32(A)(3) was satisfied. Further, he was a professor of radiology and neurosurgery at University Hospitals of Cleveland/Case Western Reserve University School of Medicine at the time of his deposition in June 2008. Additionally, when he was deposed, he had recently stepped down as chairman of the department of radiology and resumed being a full-time radiologist. Thus, he was competent to testify pursuant to Evid.R. 601(D).

{¶48} However, our analysis does not end there. Rather, Civ.R. 32 permits the use of depositions only "so far as admissible under the rules of evidence."

Civ.R. 32(A). That rule also provides that "[t]he introduction in evidence of the deposition or any part thereof for any purpose other than that of contradicting or impeaching the deponent makes the deponent the witness of the party introducing the deposition." Civ.R. 32(C).

{¶49} Evidence Rule 611 governs the mode and order of interrogation and presentation of evidence. Included in this rule is that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." Evid.R. 611(C). However, despite this limitation, " '[t]he allowing or refusing of leading questions in the examination of a witness must very largely be subject to the control of the court, in the exercise of a sound discretion.' " *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 111, 592 N.E.2d 828, quoting *Seley v. G.D. Searle & Co.* (1981), 67 Ohio St.2d 192, 204, 423 N.E.2d 831. In addition, the Rules of Evidence provide that "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility." Evid.R. 611(B).

{¶50} A trial court's ruling on these issues will stand absent an abuse of discretion. *Lambert v. Shearer* (1992), 84 Ohio App.3d 266, 275, 616 N.E.2d 965. As previously stated, an abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Blakemore*, 5 Ohio St.3d at 219, 450 N.E.2d 1140.

{¶51} In the case sub judice, the Geesamans assert that Dr. Cox made Dr. Lanzieri his witness when Dr. Cox introduced the deposition at trial. Thus, they maintain that leading questions by counsel for Dr. Cox should not have been permitted at the trial. They further contend that by allowing this deposition to be introduced, the trial court denied them the right to cross-examine Dr. Lanzieri pursuant to Evid.R. 611(B).

{¶52} A review of Dr. Cox's counsel's examination of Dr. Lanzieri during the deposition indicates that he asked many leading questions in attempting to discover the facts upon which Dr. Lanzieri based his opinions. By doing so, he was clearly cross-examining Dr. Lanzieri, who at the time of the deposition was not Dr. Cox's witness. The problem arose when Dr. Cox subsequently decided to present the deposition of Dr. Lanzieri in effect as his own witness in Dr. Cox's case-in-chief.

{¶53} In this particular deposition, however, Dr. Lanzieri was repeatedly allowed to elaborate on his answers, oftentimes providing great detail and in-depth explanations. In addition, many questions were also asked by counsel for the two other remaining defendants, Dr. Almudallal and St. Rita's Medical Center, both of whom also permitted Dr. Lanzieri to expound upon his responses. Accordingly, on the record before this court, we cannot conclude that the trial court acted in an unreasonable, arbitrary, or unconscionable manner in permitting the use of the

deposition at trial or that any prejudice resulted therefrom based upon the use of leading questions.

{¶54} As to the contention that the Geesamans had no opportunity to cross-examine Dr. Lanzieri, this assertion is without merit. During the deposition of Dr. Lanzieri, counsel for the Geesamans did ask questions of him. Although we note that counsel for Dr. Almudallal objected to the Geesamans' questioning their own witness at the deposition, counsel for the Geesamans stated: "I disagree, obviously. It's a witness, and anybody can ask questions." Counsel then proceeded to ask questions of Dr. Lanzieri. Thus, the Geesamans did have an opportunity to question the witness, including through the use of their own leading questions. Furthermore, Dr. Lanzieri was a listed witness for the Geesamans. As such, their counsel had ample opportunity to fully discover the opinion(s) of Dr. Lanzieri prior to the deposition and to fully question him on those at the deposition if he so chose. Therefore, the fifth assignment of error is overruled.

*Sixth Assignment of Error*

{¶55} In their sixth assignment of error, the Geesamans assert that the trial court erred when it permitted Dr. David Preston, the neurologist who testified on behalf of Dr. Almudallal, to render an opinion concerning two MRIs taken of Mr. Geesaman during his rehabilitation on April 15, 2005, and April 25, 2005.

{¶56} During the presentation of Dr. Almudallal's defense, counsel for the doctor called Dr. Preston to the stand. Prior to his testimony, the Geesamans'

attorney made an oral motion in limine, requesting that Dr. Preston not be permitted to testify about the aforementioned MRIs. These two MRIs showed additional infarcts in Mr. Geesaman's brain.

{¶57} Counsel's concern was that Dr. Preston would use those images to show that Mr. Geesaman was suffering additional strokes despite proper medical intervention since the April 5, 2005 stroke, thus bolstering the defense theory that nothing would have prevented the second stroke. They maintained that the problem with this sort of testimony was that during his deposition, taken a number of months before trial, Dr. Preston did not recall those images and rendered no opinions based on those images. Therefore, any testimony concerning those MRIs in support of Dr. Preston's opinions on causation was a surprise and would be unfairly prejudicial.

{¶58} The trial court agreed with the Geesamans and informed counsel for Dr. Almudallal that he could not elicit any testimony from Dr. Preston that involved those two MRIs. Counsel for Dr. Almudallal followed this decision and did not elicit any such testimony. However, during cross-examination by counsel for Dr. Cox, counsel proposed hypothetical questions to Dr. Preston using those two MRIs. Specifically, counsel for Dr. Cox asked him to assume that two other doctors testified that an MRI on April 15th and on April 25th revealed new infarcts, both occurring several days after Mr. Geesaman was readmitted to the hospital and started on aspirin and other medications/treatments. He then asked

Dr. Preston whether this would indicate that the medication was not working to defeat Mr. Geesaman's atherosclerotic disease, which was causing his strokes. Over the repeated objections by the Geesamans, Dr. Preston was permitted to answer. He answered that the subsequent strokes did indicate that the medicine was not working at that point.

{¶59} The Rules of Civil Procedure allow the discovery of opinions of experts retained by the opposing party. See Civ.R. 26(B)(5). This court has previously noted that the purpose of this rule is "to prevent surprise when dealing with expert witnesses." *Vance v. Marion Gen. Hosp.*, 165 Ohio App.3d 615, 847 N.E.2d 1229, 2006-Ohio-146, at ¶ 12, citing *Vaught v. Cleveland Clinic Found.* (Sept. 6, 2001), 8th Dist. No. 79026, 2001 WL 1034705, at *3. Moreover, "[a] litigant is not only entitled to know an opposing expert's opinion on a matter, but the basis for that opinion as well * * * so that opposing counsel may make adequate trial preparations." *Vaught*, 8th Dist. No. 79026, 2001 WL 1034705, at *3.

{¶60} Here, the opinion rendered by Dr. Preston that evidence of new infarcts in the April 15th and April 25th MRIs would indicate that the medication was not working to defeat Mr. Geesaman's atherosclerotic disease, which was causing his strokes, was an opinion not previously disclosed during his deposition. Because Dr. Preston did not recall those images and offered no opinion regarding anything seen on those images, counsel for the Geesamans did not have the

opportunity to adequately prepare for this portion of Dr. Preston's testimony. This is true regardless of who asked the questions.

{¶61} Although this would not be regarded as a direct discovery violation by counsel for Dr. Cox, who did not call Dr. Preston to the stand, it nonetheless amounts to unfair surprise and defeats the spirit of the discovery rules, particularly in light of the fact that counsel for Dr. Cox was present at the taking of the deposition of Dr. Preston and during the argument and ruling on the motion in limine. For these reasons, the sixth assignment of error is well taken as to Dr. Cox.

{¶62} However, the subject-matter of this assignment of error involves the issue of causation, not standard of care. As previously noted, given the jury's finding that Dr. Almudallal was not negligent, this assignment of error does not affect the verdict in favor of Dr. Almudallal and is overruled as to him.

{¶63} Based on all of the foregoing, the judgment of the trial court in favor of Dr. Almudallal is affirmed, the judgment in favor of Dr. Cox and Lima Radiological Associates is reversed, and the cause is remanded to the trial court for further proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

ROGERS and BROGAN, JJ., concur.

(James Austin Brogan, J., of the Second District Court of Appeals, sitting by assignment.)