[Cite as *Reed v. Ohio Dept. of Transp.*, 2013-Ohio-1515.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

MICHAEL REED, Exec., etc.

     Plaintiff

     v.

OHIO DEPARTMENT OF TRANSPORTATION

     Defendant

Case No. 2010-02065

Judge Alan C. Travis
Magistrate Anderson M. Renick

DECISION

{¶ 1} Plaintiff, Michael Reed, brings this action for wrongful death against defendant, Ohio Department of Transportation (ODOT), on behalf of himself and the heirs of decedent, Traci Reed. Plaintiff also brings an action for negligence on behalf of his minor son, Conner Reed, for injuries he sustained. The issues of liability and damages were bifurcated. Following trial on the issue of liability, the court found that Conner was injured and Traci was killed when a tree fell and struck her motor vehicle as she was driving on State Route 83 (SR 83). The court found that defendant had actual notice of a hazardous condition and that its negligence was the sole proximate cause of Traci's death and Conner's injuries. The case then proceeded to trial on the issue of damages.[1]

{¶ 2} Michael, who lives in New Concord, Ohio, married Traci on March 26, 1994. Michael and Traci had two children, Samantha, born on November 5, 1997, and Conner who was born on August 25, 2003.

{¶ 3} On December 26, 2008, the Reeds celebrated Christmas with Michael's parents and siblings. In the evening, they planned to return to their home in New Concord, Ohio, where Traci's sister, Kristen Fuller, and her family would be waiting for them to celebrate Christmas the following day. Michael and Samantha traveled home in his pickup truck and Traci and Conner followed in her vehicle. Michael and Samantha arrived at their home, and when Traci and Conner did not return, Michael and Samantha drove to SR 83, where they arrived at the scene of the accident.

{¶ 4} According to Michael, he saw Traci's body in the vehicle and also saw her body being covered with a white sheet. The first responders told Michael that Traci was dead and that Conner had been taken to the local hospital. At that time, Samantha and Michael were transported to the hospital via ambulance. Conner was later transferred to Nationwide Children's Hospital (Nationwide) in Columbus, Ohio.

{¶ 5} Thomas Galbraith testified that he is very familiar with SR 83 and that he was traveling on SR 83 when he saw the headlights of an automobile shining in a field. According to Galbraith, he was the first one to arrive at the scene of Traci's accident and he went to a nearby house to call 911. Galbraith testified that he recognized Michael when he arrived at the scene of the accident and that Michael arrived before Traci's body was covered with a sheet.

**WRONGFUL DEATH**

{¶ 6} R.C. 2125.02 provides, in part:

{¶ 7} "(A)(2) The jury, or the court if the civil action for wrongful death is not tried to a jury, may award damages authorized by division (B) of this section, as it determines are proportioned to the injury and loss resulting to the beneficiaries in division (A)(1) of

---

[1]During the course of the damages trial, the court APPROVED the parties' August 27, 2012 stipulation as to the authenticity of certain medical records and employment records.

this section by reason of the wrongful death and may award reasonable funeral and burial expenses incurred as a result of the wrongful death. * * *

{¶ 8} "* * *

{¶ 9} "(B) Compensatory damages may be awarded in a civil action for wrongful death and may include damages for the following:

{¶ 10} "(1) Loss of support from the reasonably expected earning capacity of the decedent;

{¶ 11} "(2) Loss of services of the decedent;

{¶ 12} "(3) Loss of the society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, suffered by the surviving spouse, dependent children, parents, or next of kin of the decedent;

{¶ 13} "(4) Loss of prospective inheritance to the decedent's heirs at law at the time of the decedent's death;[2]

{¶ 14} "(5) The mental anguish incurred by the surviving spouse, dependent children, parents, or next of kin of the decedent."

{¶ 15} Pursuant to R.C. 2125.02(A)(3)(b)(i), the "court may consider all factors existing at the time of the decedent's death that are relevant to a determination of the damages suffered by reason of the wrongful death."

**A. Funeral and Burial Expenses**

{¶ 16} Pursuant to R.C. 2125.02(A)(2), the court "may award the reasonable funeral and burial expenses incurred as a result of the wrongful death. * * * [T]he court shall set forth separately the amount, if any, awarded for the reasonable funeral and burial expenses incurred as a result of the wrongful death." Upon review of the

---

[2]Plaintiff has not presented any evidence as to loss of prospective inheritance.

evidence, the court finds that plaintiff incurred reasonable funeral and burial expenses in the amount of $20,133.36 which shall be awarded.

## B. Economic Damages

{¶ 17} Michael testified that Traci worked for Scioto One in Worthington, Ohio, when they met. When he became the Muskingum County wildlife officer for the Ohio Department of Natural Resources (ODNR), Traci worked for Fabri-Form Company for approximately 10 years before taking a different job in New Philadelphia, Ohio. In April 2006, she began working for the Ohio Department of Taxation (ODT). Michael explained that Traci accepted a reduction in her rate of pay when she began working for ODT, but that she was able to work fewer hours and worked closer to their home. Michael testified that Traci hoped to continue working for ODT and become a supervisor. He stated that she enjoyed her job with ODT more than her previous jobs.

{¶ 18} According to Michael, Traci intended to work for the state government for 30 years so that she could draw a full pension upon retirement. Michael explained that while Traci was working for the state, they received family health care insurance through his employer, ODNR, but that he planned to retire from law enforcement at age 52 and at that point, they intended to receive family health care insurance through Traci's employer.

{¶ 19} Plaintiff presented the expert testimony of John Burke, Ph.D., regarding Traci's expected earning capacity. Dr. Burke taught at the college level until his retirement in 1994 and is currently an adjunct professor at John Carroll University. Dr. Burke calculated the earning capacity for Traci, who was 40 years old at the time of her death. He explained that four determinations are necessary to calculate earning capacity: (1) how long the person is going to work; (2) rate of pay, including fringe benefits; (3) future rate of pay; and (4) the interest rate.

{¶ 20} Dr. Burke explained that he used three different ages to determine Traci's end working life.  First, he made computations using the statistical work-life expectancy of 55.7 years as computed by the United States Department of Labor.  Second, he used the year 2030, which is when Traci would have earned 30 years of service with the state, including purchasing service credit from her time in the Ohio National Guard.  Third, he used the retirement age of 65.

{¶ 21} Dr. Burke also calculated Traci's future pay rate.  When Traci began to work for ODT, her pay was reduced significantly from her former employment.  However, Dr. Burke testified that during her time with ODT, her wages were rising at a rapid rate.  Dr. Burke explained that he calculated Traci's pay increases from 2008 through 2012 based on a pay grid for ODT.  However, Dr. Burke admitted that he did not know if such step increases applied to Traci's position.  Defendant argues that this grid was not admitted into evidence at trial and therefore, Dr. Burke's testimony must be excluded.  Because the pay grid upon which Dr. Burke relied to calculate Traci's earning capacity was not admitted into evidence, the court cannot rely on Dr. Burke's opinion regarding Traci's prospective pay increases which were based thereon.  *See* Ohio Evid.R. 703.[3]

{¶ 22} Although the court cannot consider Dr. Burke's opinions regarding future pay increases or promotions, nevertheless, the court finds that plaintiff is entitled to some amount of damages for the loss of Traci's earning capacity.  Dr. Burke testified that in calculating Traci's pay rate from 2013 until the date of her anticipated retirement, he took the previous year's wages and added a growth rate of .88 percent.  Dr. Burke stated that this rate of growth was taken from the Bureau of Labor Statistics

---

[3]During the damages phase of the trial, defendant objected to Dr. Burke's opinion on future pay increases being based upon the pay grid that was not in evidence.  The court ruled at the time that if the grid was not offered by plaintiff, the court could not consider Dr. Burke's opinion testimony based thereon.

employment cost index and that it is based on the average increase in pay for all state and local government workers from 2001 until 2011. Therefore, computation of Traci's lost wages must be based upon her last annual salary plus the .88 percent growth rate for each year.

{¶ 23} In 2008, Traci worked until her death on December 26, and earned $37,899.84. (Plaintiff's Exhibit 19.) According to Michael, Traci intended to work for the state until she reached 30 years of service and could retire with full benefits. Dr. Burke testified that this would require Traci to work for the state for an additional 21 years.

{¶ 24} Based upon the evidence, the court finds that a reasonable amount to be awarded for the loss of Traci's earning capacity is an additional 21 years of wages, plus fringe benefits, following her death. The computation will be based on the amount that Traci earned in 2008 plus the .88 percent rate of growth for each additional year of wages. Dr. Burke testified credibly that Traci's fringe benefits included 14 percent of her wages for pension benefits and 26 percent of her wages for medical benefits. While Dr. Burke acknowledged that the Reeds were covered by Michael's health insurance, he opined credibly that Traci's medical insurance was properly included as a fringe benefit because he calculated her earning "capacity." The court finds Dr. Burke's testimony on this subject was credible. Accordingly, the court will compute each time period of lost wages or lost future earning capacity by using Traci's income from 2008 plus a yearly .88 percent rate of growth together with fringe benefits valued at 14 percent of her wages for pension benefits and 26 percent for medical benefits. Based upon Dr. Burke's testimony, the court finds that plaintiff is entitled to the loss of salary and fringe benefits from 2009 through 2012 in the amount of $216,950.

{¶ 25} Although the court cannot consider Dr. Burke's opinion regarding increases in Traci's future wages or expected or possible promotions from 2009 through 2012, Dr. Burke offered credible, admissible testimony on the loss of Traci's future earnings and benefits. Under Ohio law, a defendant is entitled to have future damages

converted to present value. *Galayda v. Lake Hosp. Systems, Inc.,* 71 Ohio St.3d 421 (1994). It is the function of the trier of fact to convert future damages to present value and although sometimes helpful, expert testimony is not required. *Sahrbacker v. Lucerne Prods., Inc.,* 52 Ohio St.3d 179 (1990).

**{¶ 26}** Because the court has disallowed Dr. Burke's testimony about Traci's future pay increases and projected job promotions, the court will calculate Traci's future wages and fringe benefits based on her 2008 earnings plus a yearly .88 percent rate of growth. Dr. Burke testified that he used a discount rate of zero to determine the present value from the years 2013 to 2023 based on the short-term interest rate.[4] Accordingly based upon her salary from the year 2008 and the yearly .88 percent growth, the lost earning capacity from 2013 until 2023 is $576,834.

**{¶ 27}** The last portion of Traci's future earnings and benefits is for the period from 2023 to 2030, the year Dr. Burke testified that Traci would be able to retire from state employment with full benefits. Dr. Burke offered credible testimony that the amount of future wages and benefits for this period must be reduced to present value by using a discount rate of .63. Therefore, based upon her 2008 wages plus a yearly .88 percent rate of growth and fringe benefits, Traci's loss of future wages and benefits for the period 2023 to 2030, reduced to present value, is $416,555.

**{¶ 28}** As set out above, the loss of wages and benefits from 2009 through 2012, together with the loss of future earning capacity and benefits from 2013 until her anticipated retirement in 2030 totals $1,210,339. However, earning capacity must be reduced for personal consumption. Dr. Burke testified that if Traci worked until she had

---

[4]While defendant argues that the interest rate used by Dr. Burke is not reliable because he chose the interest rate for United States treasuries on a single date nearly one year before he prepared his expert report, Dr. Burke explained that he retrieved the interest rate in March 2012, and that the date in his report is a typographical error. The court finds that Dr. Burke's testimony regarding the interest rate is credible.

a total of 30 years of service with the state, her earning capacity would be reduced by $370,000 for her personal consumption. Accordingly, the total of lost wages, benefits and future earning capacity is reduced to the sum of $840,339, which is awarded pursuant to R.C. 2125.02(B)(1).

{¶ 29} Plaintiff also seeks compensation for the loss of Traci's services. Michael testified that Traci performed a great deal of the work around their home. She did the grocery shopping, cooked all of the meals, cleaned the inside of the home, did the laundry, planned various parties, fixed things around the house, balanced the checkbook, and paid all of the bills.

{¶ 30} Dr. Burke also testified about the loss of services. Based upon his experience and the American Time Use Study, Dr. Burke calculated that Traci would have spent an average of 3.89 hours of her time on household services per day while a child remained in the home.[5] Dr. Burke calculated that Traci would have spent an average of 2.55 hours of household services per day after the children left the home but while Traci was still employed; and he calculated an average of 3.74 hours of household services per day from her retirement until she would have stopped providing household services to another person, which is Michael's life expectancy.

{¶ 31} Based on these rates, Dr. Burke provided three calculations, each reduced to present value, for the cost of the loss of household services for the amount of time that Traci would have provided services to another person. In his calculations, Dr. Burke included costs and taxes the Reeds would be required to pay, such as Social

---

[5]Dr. Burke calculated children remaining in the household until age 21, despite the fact that the American Time Use Survey by the United States Department of Labor is based upon children remaining in the household until age 17. Dr. Burke, based on his own studies and observations, calculated the amount of time spent on household services until the children left the home at age 21. The court finds that such determination is credible.

Security, for employing outside help for household services.[6] In the first scenario, Dr. Burke calculated an amount that represented paying someone $15 per hour, including legally required benefits that Michael would have to provide as the employer, which equals $762,748. In the second scenario, he calculated paying someone the minimum wage to perform household services, plus legally required benefits, which equals $389,793. In the third scenario, Dr. Burke calculated an amount for hiring live-in help at $100 per day for 365 days a year, which equals $1,344,000.

{¶ 32} Defendant argues that Dr. Burke's calculations for household services are "totally arbitrary" because Dr. Burke did not conduct a market survey of the area where plaintiff lives to determine the cost of hiring someone to perform household services. However, the court finds that a calculation based on the minimum wage, plus the expenses for legally employing such household assistance, is a reasonable amount under the circumstances of this case.

{¶ 33} Upon review of Dr. Burke's testimony, the court finds that $389,793 is a reasonable amount for loss of services and that amount is awarded pursuant to R.C. 2125.02(B)(2).


## C. Non-Economic Damages

{¶ 34} The two remaining elements of wrongful death damages are non-economic losses: loss of society and mental anguish. *See* R.C. 2125.02(B). R.C. 2125.01(A)(1) provides that "a civil action for wrongful death shall be brought in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent, all of whom are rebuttably presumed to have suffered damages by reason of the wrongful death, and for

---

[6]He admitted that it would be "easier" for the Reeds to hire help through a service, but that it would cost more per hour. Dr. Burke testified that hiring household help through a business would cost about $34 per hour.

the exclusive benefit of the other next of kin of the decedent." Pursuant to R.C. 2125.02, other next of kin, such as siblings, while not presumed to have sustained damages, may recover damages for mental anguish and loss of society upon proper proof thereof, even though there is a surviving parent, spouse, or children. *Senig v. Nationwide Mutual Insurance Co.,* 76 Ohio App.3d 565, 574 (10th Dist.1992).

{¶ 35} Michael testified that Samantha, who is currently in the ninth grade, was 11 years old at the time of her mother's death. According to Michael, Samantha went to counseling for a short time. Michael testified that Conner was five years old when the motor vehicle accident occurred and was a "mama's boy." Michael explained that both of his children have had to grow up fast because of their mother's death.

{¶ 36} Michael testified that he fell in love with Traci for her spirit, her character, her values, and her intelligence and that she was his best friend. He explained that she was a wonderful mother who was always there for her kids. After Conner was released from Nationwide, Michael began to see a counselor in Zanesville, Ohio. He also attended group grief counseling and was treated by a psychiatrist. He explained that during this period of time, he had no appetite and his moods changed frequently.

{¶ 37} Sandy Untied is a 1966 graduate of the Bethesda Hospital Nursing program and in 1975 she began to work for Six County Mental Health Center (Six County), which is a community mental health facility. In 1995, she became an outpatient clinician for Six County, and she is also a licensed independent social worker.

{¶ 38} Untied testified that she first treated Michael on January 12, 2009 and continued to see him on a weekly basis until June 9, 2009. As of June 2009, her impression was that Michael was suffering from bereavement as a result of a traumatic event and that he also showed signs of depression. Untied noted additional stressors that Michael experienced including personal and family illness. (Defendant's Exhibit F).

{¶ 39} In the summer of 2010, Michael sought additional counseling sessions with Untied and he also returned on August 7, 2012. On August 7, 2012, Untied noted that

Michael was being treated for Post Traumatic Stress Disorder (PTSD) and that he was still experiencing insomnia and vivid nightmares. Untied testified that she had scheduled additional sessions with Michael for the fall of 2012.

{¶ 40} Michael took short-term disability leave from his job as the Muskingum County wildlife officer following the accident. He returned to work in June 2009. In April 2012, Michael's employer, ODNR, asked him to be evaluated by a psychologist to determine if he was fit to perform his duties as a wildlife officer. Michael testified that a wildlife officer carries a weapon, supports law enforcement, makes arrests, and may use physical or deadly force. Michael was evaluated by Dr. J. Nick Marzella in April 2012, and since that time he has been "involuntarily separated" from his job as the wildlife officer for Muskingum County. He has been using his remaining short-term disability leave since April 2012.

{¶ 41} J. Nick Marzella, Ph.D., a licensed psychologist in the state of Ohio, testified that he evaluated Michael on April 5, 2012, at the request of ODNR to determine if Michael was fit for duty as a wildlife officer. According to Dr. Marzella, he diagnosed Michael with both major depressive disorder that was recurrent and severe, and PTSD. Dr. Marzella opined that the sole cause of these conditions was Traci's death and the manner of her death. Finally, Dr. Marzella determined that Michael was unfit for his job as a wildlife officer.

{¶ 42} In his post-trial brief, plaintiff states that the purpose of Dr. Marzella's testimony was to appreciate "the extent of the emotionally debilitating condition with which Mike Reed suffers" but plaintiff does not seek a separate damage award for this lost income. (Plaintiff's Post-Trial Brief, pgs. 7-8.)

{¶ 43} Michael testified that approximately one year before Traci's death he was treated by his family doctor for "stress" on his job. Michael explained that he was tense and that his physician put him on a mild depression pill, but that after a few months, he felt better. Michael testified that he has no long-standing bouts with depression. Dr.

Marzella testified that Michael's previous treatment for a "stressful" condition at work did not change his opinions.

{¶ 44} Susan Reed, the mother of Michael Reed, testified that Traci was a very good wife and mother. Susan testified that after Conner was released from the hospital, she stayed with Michael and the children at their home for nearly one month during which time Michael cried a lot, went to the cemetery, and talked to his pastor. She explained that over the last three years, Michael has had an "awful bad time" as he tries to be both a father and a mother to his children.

{¶ 45} Traci's parents, Carol and Wilbur Huff, live in Springfield, Ohio and had two daughters: Kristen Fuller and Traci. According to Carol, Traci loved being with her family. Carol testified that both she and her husband miss Traci.

{¶ 46} Traci's older sister and only sibling, Kristen Fuller, lives in Falls Church, Virginia. Kristen testified that as adults, she and Traci went on family vacations together and that she misses Traci very much.

{¶ 47} Based upon evidence and testimony presented at trial the court is convinced that Traci was a very loving daughter, sister, wife, and mother and that her death caused much mental suffering. However, the court also finds that approximately one year prior to Traci's death Michael had been treated for mild depression due to "stress," and that Michael was prone to depression. Pursuant to R.C. 2125.02(B), Traci's spouse, dependent children, parents, and sister are entitled to non-economic damages. Upon consideration of the testimony presented, Michael is awarded $1,000,000; Samantha and Conner are each awarded $500,000; Traci's parents, Carol and Wilbur Huff, are each awarded $250,000.00; and Traci's sister, Kristen Fuller, is awarded $100,000. The court awards non-economic damages for loss of society and mental anguish in the total amount of $2,600,000.

**NEGLIGENCE**

{¶ 48} At the time of the accident, Conner was five years old.  From the scene of the accident, he was taken to Genesis Hospital in Zanesville, Ohio and then transported to Nationwide for further treatment of his injuries where he remained until January 8, 2009.

{¶ 49} Yolanda Holler, M.D., is board-certified in pediatrics and neurology and is employed by Akron Children's Hospital.  Dr. Holler reviewed Conner's hospital records, including the images and reports generated from the CT scans and MRI.

{¶ 50} Dr. Holler opined that Conner sustained a right frontal skull fracture and swelling of the brain.  He also sustained two types of traumatic brain injury: contusions and diffuse axonal injury.  The contusions were located on the right frontal lobe and the left temporal lobe.  She explained that the diffused axonal injury, which is a tearing of the axons, was located on the left frontal lobe, left temporal lobe and the corpus callosum.  Dr. Holler explained that the right frontal lobe functions as the "gatekeeper" of the brain and controls areas such as attention span, ability to focus, and impulsivity. She testified that the left temporal lobe controls mood, memory, and language skills.

{¶ 51} Steven Bodin, Ph.D., is a pediatric neuropsychologist currently employed by Nationwide.  He is a licensed psychologist in Ohio and is board-certified in clinical neuropsychology.

{¶ 52} Dr. Bodin evaluated Conner in January 2009 shortly before Conner was discharged from Nationwide. Dr. Bodin testified that his post-doctoral fellow administrated the evaluation, which included conducting tests on Conner and questioning Michael.  Conner's pre-injury condition revealed that he had no history of developmental or learning disorders.  The 2009 evaluation concluded that Conner had an average IQ and language skills but that he had a low-average processing speed.  Dr. Bodin admitted that his 2009 evaluation states that Conner did not demonstrate any cognitive impairments.  However,  Dr. Bodin explained that because of Conner's age,

there were limitations to the testing available and that high-level cognitive skills, such as executive functioning and problem solving, could not be tested at such a young age.

{¶ 53} In September 2011, Dr. Bodin conducted a second evaluation of Conner at the request of Dr. Klamar, a physical medicine and rehabilitation physician at Nationwide, who was concerned about Conner's reading abilities and memory. The results of the evaluation revealed that Conner had average intelligence but that he had deficits in the areas of word retrieval, comprehension in multi-step instructions, and focused and sustained attention. However, Dr. Bodin admitted that in his 2011 evaluation, he noted that the majority of Conner's neuropsychological functions were intact. Dr. Bodin opined that the weaknesses exhibited in the 2011 evaluation were consistent with Conner's brain injuries. He explained that most of Conner's injuries were located in the frontal lobe and axons, and that those parts of the brain control attention, word retrieval, and executive function. Dr. Bodin opined that Conner's cognitive defects are related to his traumatic brain injury. Further, he opined that the cognitive deficits are permanent.

{¶ 54} Andrew Colvin, Ph.D., a neuropsychologist, testified by deposition. Dr. Colvin was contacted by defendant to perform an independent neuropsychological evaluation of Conner, which he conducted on May 30-31, 2012. Dr. Colvin testified that both he and Dr. Bodin determined that Conner has cognitive deficits that are the result of his traumatic brain injury and that such deficits are permanent.

{¶ 55} Conner underwent speech rehabilitation to improve his memory and comprehension skills following the accident. Carrie Stant is a licensed speech language pathologist and she currently works part-time for Genesis Outpatient Rehabilitation Services. According to Stant, she treated Conner at Genesis' New Concord facility. Stant testified that she did not conduct Conner's initial assessment but that she had her first session with Conner on June 2, 2010, and usually met with him for a half hour, one time per week.

{¶ 56} Stant administered the Ross Information Processing Accessing-Pediatrics (RIPA-P) on Conner, which is a test for patients with traumatic brain injury. The results of the RIPA-P showed that Conner scored in the fifth percentile for immediate memory and the third percentile for recent memory. As a result of the RIPA-P, Stant added new goals for Conner to improve his immediate and recent memory. According to Stant, she conducted exercises during her rehabilitation sessions with Conner to help improve his memory. Stant testified that Conner's final two treatment sessions showed improvement and he scored 100 percent on activities relating to his immediate memory. Conner was discharged as a patient on October 20, 2010. The discharge summary states that Conner showed overall improvement. Conner has not returned for subsequent treatments. Stant believed that her treatment of Conner was successful in a short period of time.

{¶ 57} Conner is currently in the third grade, and he is in an individualized education program at school. In the second grade, Conner received a variety of notations by teachers on his report card, ranging from "less than satisfactory" to "outstanding." Michael testified that he works with Conner at home to improve his memory and comprehension. According to Michael, Conner cannot focus for long periods of time and that he often gets frustrated. Michael stated that prior to the accident, Conner did not have any attention problems.

{¶ 58} A May 11, 2009 progress note from Michael's sessions with Untied states that Michael had to take Conner to the emergency room after Conner had fallen on the pavement and hit his head in the same location as his previous injury. However, plaintiff testified that this injury was not in the same location as his brain injury from the December 26, 2008 accident. Further, Michael explained that when he took Conner to the emergency room, the doctors performed an X-ray, and that there was nothing wrong with Conner.

{¶ 59} The court finds that the testimony presented by Drs. Holler, Bodin, and Colvin was credible. The court finds that Conner suffered a traumatic brain injury as a proximate result of the accident. Michael testified that Conner cannot focus for long periods of time and Dr. Bodin explained that Conner's injuries occurred in the parts of the brain that control attention span. Further, Dr. Colvin also testified that Conner has cognitive defects. The court finds that there is credible evidence that Conner has suffered some degree of cognitive defect as a result of his injuries and such injury is permanent. However, the court also notes that Stant testified that Conner quickly improved during his therapy. The court concludes that while Conner has suffered some permanent injury in his cognitive abilities, it is not as significant as plaintiff asserts. The court awards $500,000.00 for Conner's pain and suffering and permanent injury.

{¶ 60} Expenses were incurred for Conner's hospitalization and medical care. Plaintiff submitted evidence that Conner's medical bills totaled $54,146.45 (Plaintiff's Exhibit 22), and the parties stipulated that $39,701.81 of that sum was paid by plaintiff's health insurance carrier, Medical Mutual. Pursuant to R.C. 2743.02(D), "[r]ecoveries against the state shall be reduced by the aggregate of insurance proceeds, disability award, or other collateral recovery received by the claimant." Accordingly, the court finds that plaintiff is entitled to $14,444.64 for Conner's medical expenses.

{¶ 61} In summary, $3,850,265.36 shall be awarded for plaintiff's wrongful death claim and $514,444.64 for plaintiff's negligence claim on behalf of Conner Reed. $4,364,735 shall be awarded in total damages, which includes the $25 filing fee.

{¶ 62} R.C. 2743.02(D) provides that:

{¶ 63} "Recoveries against the state shall be reduced by the aggregate of insurance proceeds, disability award, or other collateral recovery received by the claimant."

{¶ 64} Based on the parties' stipulation[7], the court finds that plaintiff has received collateral benefits as follows:

{¶ 65} Life Insurance: Lincoln National Life Insurance Co. $100,000; Prudential Life $40,000;

{¶ 66} OPERS Survivor Death Benefits: Michael $32,788.48; Samantha $18,392.64; Conner $18,392.64;

{¶ 67} Nationwide Insurance Company: $10,000 death benefit; $5,000 Med Pay Policy limit;

{¶ 68} Social Security Death Benefits: Samantha $56,663; Conner $56,663; Michael Funeral Benefit of $255 and temporary disability benefit of $4,108;

{¶ 69} Medical Mutual: $39,701.81 for Conner's medical expenses.[8]

{¶ 70} Pursuant to *McMullen v. Ohio State Univ. Hosps.,* 88 Ohio St.3d 332, 342 (2000), this court has the duty to deduct collateral benefits received by each beneficiary from that beneficiary's share of the award as adjusted by the probate court. This court makes the collateral-source deductions only after the probate court has adjusted the share of each beneficiary pursuant to R.C. 2125.03(A)(1). *Id.; see also Buchman v. Wayne Trace Local School Dist. Bd. of Edn.,* 73 Ohio St.3d 260 (1995); *Robertson v. Dept. of Public Safety*, Ct. of Cl. No. 2001-09214, 2005-Ohio-5069.

{¶ 71} The court will conduct periodic conferences to discuss the status of the probate court proceedings. The first of such conferences shall be held on *April 25, 2013, at 9:30 a.m.* The court shall initiate the conference via telephone.

---

[7]The court hereby APPROVES the parties' August 27, 2012 stipulation regarding the collateral benefits that have been received.

[8]The court has already deducted from its award the collateral benefits received for Conner's medical expenses.

_____
ALAN C. TRAVIS
Judge



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

MICHAEL REED, Exec., etc.

    Plaintiff

    v.

OHIO DEPARTMENT OF TRANSPORTATION

    Defendant

Case No. 2010-02065

Judge Alan C. Travis
Magistrate Anderson M. Renick

JUDGMENT ENTRY

{¶ 72} This case was tried to the court on the issue of plaintiff's damages.  The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of plaintiff in the amount of $4,364,735, which includes funeral expense, loss of earning capacity, loss of services, loss of society and mental anguish, plus the $25 filing fee paid by plaintiff.  It also includes $514,444.64 for plaintiff's negligence claim.

{¶ 73} This court shall conduct a hearing on the issue of collateral source setoff and enter final judgment after the probate court completes its apportionment.  This case has been scheduled for a status conference for *April 25, 2013, at 9:30 a.m.,* to discuss

Case No. 2010-02065          - 2 -              JUDGMENT ENTRY

the status of the probate court proceedings.  The court shall initiate the conference via

telephone.


_____
ALAN C. TRAVIS
Judge

cc:


Blair L. Magaziner                    Craig S. Rapp
R. David McGlade                      William C. Becker
W. Andrew Joseph                      Assistant Attorneys General
44 South 6th Street                   150 East Gay Street, 18th Floor
P.O. Box 970                          Columbus, Ohio 43215-3130
Zanesville, Ohio 43702-0970

Patrick J. Hart
50 South Main Street, Suite 504
Akron, Ohio 44308

007
Filed February 4, 2013
To S.C. Reporter April 16, 2013